**MANUEL BROTHERS, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 97–4C.

United States Court of Federal Claims.

Dec. 23, 2002.

Steven J. Wright, and Mark L. McAlpine, McAlpine & McAlpine, P.C., Bloomfield Hills, Michigan, for the plaintiff.

Monica J. Palko, Commercial Litigation Branch, Robert E. Kirschman, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, for the defendant.

## OPINION

HORN, Judge.

The plaintiff, Manuel Brothers, Inc. (MBI), filed its complaint requesting this court to award damages arising out of a lump sum price construction contract with the Federal Aviation Administration (FAA). MBI was awarded Contract Number DTFA07–94–C–03079 (contract), in the amount of $5,235,455.00, on March 9, 1994. The scope of the contract was for the construction, including excavation, of concrete encased ductbanks with associated manholes for the installation of fiber optic cable at the Dallas/Fort Worth Airport, Texas (DFWA). MBI has claimed damages in the amount of $2,211,744.79. Although encompassed in one very general breach of contract count, following trial, it appears that the breach claim

is based largely on the defendant's alleged breaches and other obligations as follows: 1) the defendant's failure to disclose its superior knowledge as to the true soil conditions at the contract site; 2) failing to clarify the misimpression created by the defendant's representation that the soil conditions at the contract site were normal; 3) the government's breach of the implied duty to cooperate by failing to provide sufficient escorts onto the aircraft operations area (AOA) so as not to unduly restrict MBI's access to work areas and the denial of permanently extended work shifts; 4) the government's interference with the plaintiff's right and plan to complete the majority of its work by mid-November 1994; 5) the defendant's submission of defective and incomplete design drawings which inaccurately depicted underground utilities or which failed to show existing utilities; 6) the government's failure to respond in a timely manner to requests for information and clarification necessitated by the defective design drawings; and 7) the government's failure to fully compensate MBI for the costs of the defective drawings and differing site conditions.

**FINDINGS OF FACT**

### I. MANUEL BROTHERS, INC.

MBI was formed by Richard, John and Al Manuel in 1977 as a general contractor for the construction of telecommunications ductbanks, the installation of copper, now fiber optic cable, and other similar underground communication installations. At the time of the contract at issue, the company had $15 million in annual revenue, John and Al had retired, Richard Manuel was president of MBI, and Richard's son, Paul Manuel, was the controller. As controller, Mr. Paul Manuel assisted the project manager of a given contract in the organization of the necessary manpower, contract equipment, including rental agreements and purchasing, payroll and equipment expenses, as well as other accounting responsibilities.

During contract solicitation and through performance, Gary Smith was MBI's general manager, later becoming president of MBI. At the time of the contract, Mr. Smith's duties included estimating projects on which the company bid, overseeing projects as they were performed, purchasing materials for the various jobs, job costing, and quality control of projects through the supervision of the on-site project managers. From the start of construction until January 1995, the on-site project manager for the contract was Robert Fureby. Duane Fureby, Mr. Robert Fureby's brother, subsequently became the on-site project manager until the contract was completed. Mr. Robert Fureby's duties began before construction, however, when he estimated and prepared the contract bid that MBI submitted to the FAA. Specifically, Mr. Robert Fureby prepared the estimates for excavation, materials required for the project, and prepared the production estimates. In addition, Mr. Robert Fureby, on behalf of MBI, attended the site visit and the pre-bid conference held by the FAA at the DFWA.

### II. CONTRACT SOLICITATION

On December 6, 1993, the Acquisition Section (ASW–55A) of the FAA issued solicitation number DTFA07–93–B–00030 for the performance of the following: "Construction to include excavation, concrete encased ductbanks with associated manholes, installation of fiber optics cable to include but not limited to crossing beneath airport roads, taxi ways, runways, etc. at the Dallas/Fort Worth International Airport, Texas, in accordance with the attached specifications and drawings" (DFWA south ductbank loop project). The procurement was unrestricted regarding business size and had an estimated bid range of $5 million to $10 million. MBI learned of the solicitation through the Commerce Business Daily (CBD)[1] and ordered the plans and specifications for the project shortly thereafter. The plans and specifications received by MBI included the description of the project, plans and specifications for con-

---

1. The CBD lists notices of proposed procurement actions, contract awards, sales of government property, and other procurement information. A new edition of the CBD is issued every business day. Each edition contains approximately 500– 1,000 notices. Each notice appears in the CBD only once. *See* Department of Commerce, United States of America, CBDNet, Readers Guide *at* http://cbdnet.gpo.gov/read-gd.html.

struction of the project, and all other terms and conditions that would form the basis of the contract once a bid was accepted and the contract was executed by the potential offeror and the defendant.

The solicitation required the offeror to begin performance within five calendar days after receiving the Notice to Proceed and complete the contract within 365 calendar days. The offeror was required to supply performance and payment bonds within fifteen days after contract award.

The solicitation included Part I, Section G, "Contract Administration Data." Under subsection G–1, "Order of Precedence—Construction," of Part 1, Section G, the contract provided that:

> Any inconsistency in this solicitation shall be resolved by giving precedence in the following order: (a) the Schedule (excluding the specifications); (b) representations and other instructions; (c) contract clauses; (d) project specifications; (e) project drawings; and (f) other documents, exhibits, and attachments.

The solicitation also incorporated by reference, under Federal Acquisition Regulation (FAR) 52.252–2, numerous clauses that would govern the contract. *See* 48 C.F.R. Chapter 1 (1994). In particular, the solicitation incorporated FAR 52.236–2 "Differing Site Conditions," 52.236–3 "Site Investigation and Conditions Affecting the Work," 52.248–3 "Value Engineering–Construction," 52.232–5 "Payments under Fixed–Price Construction Contracts," 52.212–12 "Suspension of Work," 52.214–6 "Explanation to Prospective Bidders," and 52.243–4 "Changes."

The specifications of the solicitation detailed the restrictions the potential contractor would encounter working on the AOA of the DFWA. The specifications required by the FAA identified restrictions on the work shifts available to the contractor, runway closures during construction, various work site requirements and restrictions, the escorting of construction vehicles, safety and security precautions, height restrictions and requirements, barricading and marking of work areas, procedures for working around underground cable and utilities, and other AOA restrictions. In addition, the DFWA provided its own requirements which were integrated into the solicitation. The DFWA work limitations included work restrictions in and around the AOA, varied airport access requirements, and other restrictions, including enforcement provisions for these DFWA procedures.

## III. PRE–BID CONFERENCE

The solicitation provided interested offerors with notice of a pre-bid conference in early January 1994, for the purpose of providing a question and answer session on the DFWA south ductbank loop project. The pre-bid conference notification also encouraged the potential offerors to make a site visit/inspection of the project the day of the pre-bid conference. The pre-bid conference was scheduled for 1:00 p.m. on January 12, 1994, at the Dallas/Fort Worth Business Center (Business Center), located within the DFWA. The notification of the pre-bid conference required offerors to submit questions regarding the solicitation to the Contracting Officer (CO) in writing no later than January 5, 1994. The government required all questions to be submitted in writing by January 5, 1994, because the CO was required to forward the questions to the technicians and engineers responsible for the plans and specifications of the project. The questions regarding the solicitation were to be addressed to CO Martha L. Tressler,[2] and all submitted questions would be answered and compiled to form the agenda for the pre-bid conference. The questions and answers comprised the "Response to Request for Information/Clarification Solicitation DTFA–07–93–B–00030 as of 7 Jan 94 Questions from the Contractors" (Answers to Solicitation Questions from Contractors). According to the testimony of CO

---

2. Ms. Martha L. Tressler was the CO for the DFWA south ductbank loop project and prepared the solicitation, plans and specifications, and ultimately awarded the contract to MBI. Ms. Tressler retired from the FAA in July 1995. Ms. Tressler notified MBI, by letter dated April 21, 1994, that effective April 22, 1994, George Ramsey was relieving Ms. Tressler as CO for the DFWA south ductbank loop project. Mr. Ramsey was the CO for the construction phase of the project.

Tressler at trial, in an effort to provide all potential bidders with the same information, if a potential bidder submitted a question after the January 5, 1994 deadline, the CO would disregard the question because she could not guarantee all potential bidders would have the same answers to the same questions. CO Tressler also testified that if a question came in after the deadline and the question was important, the question would be answered and be sent to the potential bidders in an amendment to the solicitation.

The established procedures for contractor solicitation questions were not followed in two instances documented at trial. A written question regarding a soils report on the project site was received by CO Tressler on January 6, 1994 and was forwarded to FAA engineering for an answer. According to testimony received at trial, however, the question was apparently not answered by FAA engineering and, therefore, not discussed at the pre-bid conference. In addition, a written question received on January 10, 1994, regarding ductbank loops, was forwarded to FAA engineering on January 11, 1994 for an answer, yet, this question was answered and compiled in the Answers to Solicitation Questions from Contractors, and not sent in an amendment as stated by CO Tressler.

The Answers to Solicitation Questions from Contractors included the question: "Specifications Section SS–G–500 'Existing Utility Exploration' is missing from Specifications it is referred to in other parts of the Specifications." The question submitted referred to the solicitation specification titled "Construction Provisions, 100–3.2 Electrical Work Provisions, a. Existing Underground Utilities." This provision of the specifications stated:

> Per Item SS–G–500, "Existing Utility Exploration", it is the Contractor's responsibility to pinpoint underground lines to avoid unplanned disruptions or disturbing of installation or operation of underground lines in construction areas. The Contractor shall use cable tracing equipment or other methods approved by the RE [Resident Engineer] at his disposal, to pinpoint line locations. Excavation shall not pro-

ceed until all underground lines have been identified to the satisfaction of the RE.

The defendant's response to the question in the Answers to Solicitation Questions from Contractors stated that "Existing Utility Exploration has been performed under a separate contract. The information will be made available as soon as possible." The Answers to Solicitation Questions from Contractors also contained an inquiry that asked, "Have there been soil boring samples?" The defendant's response, "No."

CO Tressler conducted the pre-bid conference on behalf of the FAA. Mr. Robert Fureby attended the conference for the plaintiff. According to testimony received at trial, the Business Center had a long table in the center of the room with CO Tressler seated at the head of the table and various DFWA Operations officials and an FAA supervisor of construction seated near the CO. The bidders attending the conference were seated near the center table and along the outer walls of the conference room. At trial, Mr. Robert Fureby testified that he did not know if anyone was taking notes or minutes for the defendant, nor did he recall whether he received any notes or minutes after the pre-bid conference. Mr. Robert Fureby testified that he asked CO Tressler, who was sitting ten to twelve feet in front of him, whether it would be possible to dig potholes in the AOA to determine the soil conditions since there was no geotechnical information in the solicitation specifications. Mr. Robert Fureby further testified that the response from CO Tressler was "absolutely not." Mr. Robert Fureby testified that he then asked the CO how a bidder should determine the ground conditions of the AOA if potholing was not permitted. According to Mr. Robert Fureby, "She [CO Tressler] said to bid it as if there were normal soils and if it was anything different it would be dealt with after the award of contract."

Mr. Robert Fureby's testimony then addressed the site visit/inspection of the project. The witness testified that the attendees of the conference boarded two busses and drove onto the AOA, following the course of the construction project, occasionally getting

out to have a closer look at the project pathway.

The plaintiff also submitted the affidavit of Jack Hutson. Although Mr. Hutson attended the pre-bid conference as a representative of another potential bidder on the project, after contract award, he was employed by the plaintiff as a foremen on the DFWA project. The affidavit was executed on July 25, 2000, detailing the affiant's attendance at the pre-bid conference. Mr. Hutson's affidavit confirmed Mr. Robert Fureby's testimony that he heard Mr. Robert Fureby ask CO Tressler whether soil borings could be taken on the construction site and that no soil borings would be permitted. Mr. Hutson also stated that Mr. Robert Fureby then asked how a contractor should bid the project without soil information and CO Tressler said to bid the project assuming normal soils, and if not, an adjustment would be made after the commencement of construction.

The defendant's witnesses regarding the pre-bid conference included CO Tressler, Terry Manning, the FAA project manager, and Fred DeMalade, a contractor of the DFWA, assigned to assist the FAA Resident Engineer (RE) and there to serve as an AOA escort. Mr. DeMalade, evidenced a poor memory of the pre-bid conference and offered little useful information. Mr. Manning testified that he attended the pre-bid conference and sat either to the right or the left of CO Tressler. Mr. Manning stated that although the room was very loud with conversation, he could hear all the questions that were directed at the CO. Mr. Manning further testified that he did not hear anyone at the pre-bid conference ask the CO what type of soils were at the project area, nor if soil borings would be permitted.

The defendant also called CO Tressler to testify regarding the pre-bid conference and the site visit/inspection of the project and submitted the affidavit of Atul K. Patel, an employee of a DFWA contractor who provided engineering support services to the FAA for the contract period. CO Tressler testified that she did remember that oral questions were asked at the pre-bid conference, however, she could not recall anyone inquiring about the type of soil at the DFWA, nor

could she remember anyone requesting soil borings. Mr. Patel, who also attended the January 12, 1994 pre-bid conference and the site/inspection visit, and also sat at the table with CO Tressler, stated that no one inquired about the soil conditions at the DFWA.

## IV. MANUEL BROTHERS, INC.'S CONTRACT BID

Before the pre-bid conference, Mr. Robert Fureby studied the plans and specifications for the project and calculated MBI's estimates for bidding the contract. Following the pre-bid conference, Mr. Smith prepared a bid summary using Mr. Robert Fureby's estimates. MBI's bid was the tabulation of the bid summary, and included overhead of eleven percent, and a mark up of fifteen percent. MBI submitted a bid to the FAA for the DFWA contract in the amount of $5,235,445.00.

At trial, Mr. Robert Fureby testified regarding his method for interpreting the requirements of the plans and specifications of the solicitation and formulating an estimate of the labor hours and materials required for completion of the contract. The proposal consisted of laying fiber optic cable in underground concrete encased ductbanks, which followed six predetermined pathways, or lines, that connected various air traffic control towers and navigational aid stations of the southern loop of the DFWA. The plaintiff's bid was comprised of the essential components for estimating the cost of the DFWA south ductbank loop project. The first item to be estimated was potholing for finding underground utilities and cables on AOA; second, the cost and installation of the manholes that were required along each of the various concrete ductbanks; third, the cost and materials required for the six lines of ductbanks that consisted of the project; fourth, the cost of furnishing and pulling the fiber optic cables through the concrete encased ductbanks. The plaintiff's final estimating determined the cost of the various bores that would house the casing for the running of the fiber optic cable under taxiways and runways and site restoration that would complete the project.

At trial, Mr. Robert Fureby explained the plaintiff's contract bid in relation to each of the elements that comprised the necessary work on each of the six ductbank lines of the DFWA south ductbank loop project. For example, he explained the bid in terms of the rate of excavation and installation of the manholes on the lines, the boring production and the installation of the casing within the bores, trenching productivity on the lines, and the crew and materials required for the lines of the project, including the production rate for each crew. Mr. Robert Fureby testified that the same analysis was used for all six lines of the project.

The main crews used on the project included the potholing crew, the trenching crew, the manholing crew, and the boring crew. The potholing crew was charged with the responsibility of locating the existence of underground utilities and cables. The potholing crew verified the location and depth of the underground utilities ahead of the trenching operations and/or manhole excavation and installation operations. Once the potholing crew located a utility, they would excavate the utility by hand or with the aid of an excavator and then backfill the excavated area with sand to allow the trenching crew to easily relocate the utility with minimal effort.

The trenching crew's responsibility included excavating the specified trench along one of the six lines designated by the plans and specifications of the contract. After excavation, the crew would lay rebar in the trench, followed by conduit, multi-duct, spacers, pouring concrete for the encasement of the conduit, and, finally, backfilling the trench with the excavated soil. The contract plans and specifications required the various trenches and the resulting concrete ductbanks to drain into existing manholes or manholes that were required to be installed by the plaintiff. The manholing crew excavated the area needed to place the manhole in the ground, installed the manholes, and backfilled around the manholes. The contract also required the concrete ductbanks to run under existing runways and taxiways. Often, the ductbanks could be connected to existing ductbanks that contained existing utilities, however, the contract also required the plaintiff to bore under taxiways and runways when existing ductbanks were not available. The boring crew was charged with the boring operations under the existing runways and taxiways since trenching could not be used for some of the installation of the ductbanks and the fiber optic cable.

Next, using the same analysis throughout the estimating, Mr. Robert Fureby testified to the specific materials needed to complete each stage; including spacers, purchasing concrete from a batch plant with nighttime and daytime rates, rebar, vehicles, tracer wire, marking tape, ground rod, buried markers and other miscellaneous items. Mr. Robert Fureby also testified to the estimated project overhead, which included barricades used around the excavation work and gate guards who monitored traffic on the AOA.

Mr. Robert Fureby then testified regarding his estimate and the bid summary in relation to utilities. "Section 01010—Summary of Work" detailed various requirements of the work under the contract. Subsection 1.09(M)(5)(a) under this section detailed the technique for the mapping of existing underground cables and utilities. The provision stated:

> The Contractor shall develop an overall utility and cable chart/map that shall be maintained throughout the construction. This chart/map shall have all underground utilities and cables shown, including the field survey information and other utility information provided by the FAA, DFW[A], telephone, electrical and other utility companies, and shall be kept in the Contractor's office. It is the Contractor's responsibility to notify all utility companies as well as the Contracting Officer to ascertain that they have all available as-built information. This chart/map shall be furnished to the Contracting Officer at the completion of the project.

Subsection 1.10(J)(3) describes the procedures for working around utilities:

> The Contractor shall take all measures necessary to accurately locate the routing of underground cable and utilities within project areas to be excavated, trenched or drilled. Contractor shall locate underground cables and utilities by hand-digging

or as approved by the Contracting Officer. Once located, highly visible and durable markers shall be placed within the work areas along all such cable and utility routes at intervals of not greater than 25 foot. The Contractor shall maintain these markers in their original locations throughout the project. The Contractor shall also be responsible for providing a field survey and plan of the marker locations and shall replace any disturbed markers at his own expense. Power equipment with teeth shall not be used when excavating where cables are marked.

Appendix A of the contract also addressed utility exploration in Section 1.10, Underground Utility Location Procedures. The procedures identified in Appendix A required the contractor to contact representatives of each agency responsible for underground utilities and request their attendance at the first construction meeting of each month to review planned underground utility location requirements for the upcoming month. The contractor was directed to provide a map of planned excavation and allow the utility representative to flag all utilities with the approximate location. The map and survey of all of the flagged utilities was to be kept current and continuously posted.

Mr. Robert Fureby detailed his estimate regarding the labor and time required by the contract provisions for working around the utilities. When he prepared the estimates, Mr. Robert Fureby stated that he "went through the construction drawings and did a count page by page." Mr. Robert Fureby testified that his estimate was based on the specific number of utilities included in the construction drawings and did not believe that MBI would have to find and locate utilities that were not on the drawings because he "believed that what was on the drawings had been taken off as built records of the DFW[A], and that it was inclusive." The plaintiff encountered ninety-one more utilities then were indicated on the plans and specifications supplied by the FAA for the project.

Finally, included in Mr. Robert Fureby's estimate for bidding the project was the production delay that would be caused by the requirement of escorts. Under the contract, the FAA specified work requirements and restrictions that included the provision that "Vehicle and Contract Specified Haul Routes: escorts on the airfield shall be escorted by DFW[A] AO [Airport Operations] officers." Specifically, the contract provided the following:

> DFW Airport AO escorts may be limited. The Contractor should expect and plan for some delays in the movement of personnel, equipment, and material to and from the contract sites. Every effort will be made by the Contracting Officer to reduce impact to the construction.

Although Mr. Robert Fureby testified that he did not specifically include delay time into his estimate, he did state that he reduced his production rates for the project to account for the associated delays caused by the escorts.

## V. CONTRACT AWARD AND MANUEL BROTHERS, INC.'S WORK SCHEDULES

A total of thirteen bids were opened on February 11, 1994 by CO Tressler. All thirteen bids acknowledged three earlier amendments to the solicitation and ranged from a low of $4,631,000.00 to a high of $9,792,591.00. MBI's bid was the second lowest and it was awarded the contract by letter dated March 9, 1994. The March 9, 1994 letter stated: "You are advised that no work shall be performed at the construction site until an official Notice to Proceed has been issued by the contracting officer. After Government approval of the submittals, materials may be purchased and expenses incurred at other than the construction site." Intelcom Support Services, Inc., filed a bid protest with the FAA on February 28, 1994. MBI was notified on March 17, 1994, and was instructed "that no further action be taken by Manuel Brothers, Inc. to proceed until the protest is resolved. You will be notified by the FAA when a resolution is reached." On April 4, 1994, the FAA confirmed in writing to MBI that the FAA must receive and approve submittals required by the contract "prior to a notice to proceed."

The bid protest was resolved on April 7, 1994, and the FAA issued the official Notice to Proceed on the contract, dated May 27, 1994. The effective date of the Notice to Proceed was June 14, 1994, with a scheduled completion date for the project of September 12, 1995. The correspondence notified MBI that Mark Colditz was assigned as the RE. On June 1, 1994, MBI submitted its schedule of values for FAA approval as required under contract provision Part II, Section I, 52.232–5. The schedule of values is a breakdown of the various items of work to be done to complete the project. MBI's submitted schedule of values had eleven items with description, quantity, unit, unit price, and the extension. Attached to the schedule of values was a detailed breakdown of the materials and project description for each of the units or lump sum price.

On or about June 10, 1994, MBI submitted its first proposed Progress Work Schedule. Pursuant to the proposed Progress Work Schedule, MBI proposed to complete the trenching and boring work within twenty-two weeks, and installation of the fiber optic cable approximately two weeks later. Essentially, the proposed Progress Work Schedule had MBI completing the majority of the contract work by November, with a commencement date of June 14, 1994, the effective date of the Notice to Proceed. MBI then anticipated a fourteen week voluntary stand down period through the winter of 1994–1995, with five weeks of remaining site restoration work, and completion of the project in April 1995.

CO Ramsey did not approve MBI's proposed Progress Work Schedule. CO Ramsey determined that a majority of the work, close to ninety-nine percent, was scheduled to be completed in twenty-two weeks. CO Ramsey stated at trial that the solicitation provided the contractor sixty-five weeks for project completion and found that the plaintiff's initial, proposed Progress Work Schedule was overly optimistic. After explaining his position to Mr. Robert Fureby that he believed that MBI could not complete the project

within twenty-two weeks, CO Ramsey testified that MBI voluntarily withdraw the initial Progress Work Schedule. In the interim, on June 13, 1994, the FAA held the preconstruction meeting, and on June 14, 1994, the Notice to Proceed became effective. Although the plaintiff did not have a Progress Work Schedule approved by the date of the Notice to Proceed,[3] CO Ramsey allowed work to begin on the project. On July 20, 1994, CO Ramsey approved a second Progress Work Schedule submitted by the plaintiff. The second Progress Work Schedule had the project completed after fifty-two weeks.

The plaintiff, however, began mobilization of the construction project before the effective date of the Notice to Proceed. The FAA RE's Construction Diary, maintained by RE Colditz, detailed on May 26, 1994, that the plaintiff continued mobilization at the staging area of DFWA, yet the Notice to Proceed had not been issued. The RE's diary recorded the presence of MBI personnel and equipment and the continuation of "pre-NTP work in the staging area" of the DFWA south ductbank loop project site from May 26, 1994 until the effective date of the Notice to Proceed, June 10, 1994.

## VI. COMMENCEMENT OF CONTRACT WORK BY MANUEL BROTHERS, INC.

The effective date of the Notice to Proceed, was Tuesday, June 14, 1994. On December 9, 1995, CO Ramsey issued plaintiff a final acceptance of work. During the approximately eighteen month period between the beginning of construction and final acceptance, four factual categories emerge that are at issue regarding the claims brought by the plaintiff. First, the presence of expansive clay soils and rock encountered during the construction of the ductbanks combined with the inclement weather, second, the availability of escorts during the construction period, third, the presence of additional utilities encountered by the plaintiff during construction, fourth, the production rate of plaintiff,

3. Part I—Section G, Contract Administration Data, required the contractor to submit the Progress Work Schedule at the preconstruction meet-

ing or within five calendar days of the Notice to Proceed.

including the failed 630 foot auger bore under the INDIA taxiway.

## A. EXPANSIVE CLAY SOILS, ROCK, AND INCLEMENT WEATHER

The plaintiff has alleged that the presence of expansive clay soil at the project site, combined with abnormal rainfall and encountering rock during excavation, serve as the factual basis for many of its claims.

Mr. Robert Fureby testified that after attending the pre-bid conference and in preparing his bid for the contract, his understanding was to bid the project as if there were normal soils and that he understood the term normal soil to mean that it would not affect the calculations for bidding the contract. Among the subcontracting bids received, used by the plaintiff to prepare its bid, but not the one accepted by the contractor, was a quote from a boring subcontractor that indicated the quote was based on working with "Sandy Clay." In his testimony, Mr. Robert Fureby, however, stated that although "[t]here may have been some clay that was not problematic . . ., we didn't run across any sandy clay on the job." In addition, the parties presented two experts to testify regarding the differing types of soil present at the project site and the impact the different soil types had on the construction. According to the parties' soil experts, the type of soil that the plaintiff encountered on this project can be classified as "highly" or "very expansive clay."

The soil experts testified that a contractor will experience great difficulties working with expansive clay soils. The difficulty arises when expansive clay soils become wet and then become plastic, greasy or sticky. When expansive clay soils become plastic, the ability to operate construction equipment in these soils is very difficult. The plaintiff's soil expert, Mr. Brumund, testified that when the expansive clay soils are plastic and are excavated, "you oftentimes will have problems with the material sticking in the in-loader bucket, or the track hoe bucket . . . You have to take the back hoe bucket and thump it on the ground to get it out of the back hoe bucket." The defendant's soil expert agreed and stated in his report that "[t]here is no doubt that highly plastic clay soils take longer to dry, following heavy rainfall,. and are more difficult to clean off the equipment due to being 'sticky,' than more sandy soils." In fact, the presence of expansive clay soils made it difficult for the various crews working on the project. For example, the excavators used for digging the various trench lines were seen having difficulty "emptying their buckets, slamming them on the ground, trying to get the material out of the buckets." Indeed, it appears from the record that the design and specifications for this project were designed knowing that expansive clay soils were present at the DFWA.

On or about July 18, 1994, Mr. Robert Fureby submitted to CO Ramsey a Value Engineering Change Proposal (VECP). The VECP was a proposed change to the engineering specifications of the project, that, if accepted, could have produced cost savings to the defendant and plaintiff. The specifics of the VECP submitted by the plaintiff would have resulted in a reduction of the slope of the trench lines which would have raised the manholes and the ductbank elevations.

CO Ramsey, by letter dated August 12, 1994, rejected the VECP submitted by the plaintiff. CO Ramsey stated the VECP was rejected because:

> The expansive clay soils at the Dallas/Fort Worth Airport have been known to move as much as six (6) inches vertically in a given year. The 1% slope assures a larger margin of error if differential settlement does occur under the duct bank conduits . . . The design parameters are based on Dallas/Fort Worth Airport's requirements for duct bank installation. The airport contract, "DFW/FAA Air Traffic Control Tower Ductbanks" was designed and constructed with 1% slopes on the conduit.

CO Ramsey testified that although he learned of the presence of expansive clay soils at DFWA when he evaluated the VECP, the actual design of the DFWA south loop ductbank project had been engineered to take into account expansive clay soils.

The frequency of rain at the project site also became important, considering the interaction of the rain with expansive clay soils. According to the parties' soil experts, when expansive clay soils become wet, contractors have difficulty working with the materials and have to work harder to aerate the soil for backfilling and adjusting the water content to an optimum range for compaction. In fact, CO Ramsey stated in his deposition that when the rain combined with expansive clay soils, it caused production losses for the plaintiff and that the contractor did not get to go onto the AOA and do work.

On July 12, 1994, plaintiff sent a letter to the defendant requesting a six-day, twelve-hour per day operation because of the inclement weather, which since the beginning of the construction project had caused minimum completion percentages for all operations. The six-day, twelve-hour work week was necessary, according to the plaintiff, to utilize all favorable weather conditions in order to return to their established production requirements. CO Ramsey denied the request for a six-day, twelve-hour per day work week on July 20, 1994, and explained that he only could consider requests for additional work days on an individual basis. The defendant did grant additional work days on an individual basis throughout the project, allowing the plaintiff twenty-three additional work days. Another example of production losses is described in plaintiff's letter, dated September 6, 1994, requesting an extended work week from the defendant due to rain that had occurred over the previous weekend. The correspondence detailed the delay due to the necessary removal of water from the open trench work. The FAA denied the request for the extended work week on this occasion.

Although Mr. Robert Fureby testified that he accounted for the impact that inclement weather would have on the production rate of his work crews in the bid, the weather conditions experienced by the plaintiff were not the norm. According to CO Ramsey's testimony, "the 30 year norm, the months of May, April, October, June, September, March, November, July and August are the wettest months, in that order," based on averages compiled by the National Oceanic and Atmospheric Administration. Yet, CO Ramsey testified that the rainfall experienced by the plaintiff during the contract period was nearly double the normal thirty-two inches for the time period.

The combination of expansive clay soils and inclement weather was not the only ground condition that the plaintiff encountered on the project. Three days after the start of construction, by letter dated June 17, 1994, the plaintiff sent the defendant a notice under the Differing Site Conditions clause of the contract. According to the correspondence sent to CO Ramsey, MBI encountered rock within six inches of existing ground elevations at various ground locations. In support of the differing site condition, the plaintiff recounted Mr. Robert Fureby's experience at the pre-bid conference and his exchange with CO Tressler. The June 17, 1994 letter stated that:

A question was raised concerning the possibility of potholing to determine ground conditions. The response was absolutely not. The next question was how do we bid this project since you do not offer a geological survey, and you will not allow any exploratory excavation. The answer was represented as follows: bid the project as if the soil conditions are normal. If soil conditions are found other than normal, it will be dealt with after award of contract.

At the time the June 17, 1994 differing site condition letter was sent to CO Ramsey, the plaintiff had just begun its trenching and excavation work and no significant adverse weather had occurred to effect soil conditions. According to the RE's diary, June 17, 1994, was the first day manhole work and boring work began and the weather conditions were "sunny" and "dry."

On June 21, 1994, CO Ramsey sent MBI a letter confirming earlier verbal instructions to proceed with the project despite the rock differing site condition. The correspondence stated that MBI was "to proceed with the work on a NOT TO EXCEED amount of *$25,000.*" (Emphasis in original). CO Ramsey informed the plaintiff that the RE would issue a Change Order Proposal to resolve the amount incurred by the plaintiff dealing with

the differing site condition. CO Ramsey did not address the purported statements of CO Tressler at the pre-bid conference concerning normal soils at the DFWA.

By letter dated, July 10, 1995, the plaintiff's project manager, Chris Cook, notified the defendant of a second rock differing site condition encountered while excavating. The notification of the differing site condition stated that "[t]he Contractor's operation was delayed sufficiently to require an Extra Work request for the rock removal."

### B. ESCORTS DURING THE CONSTRUCTION PERIOD

The plaintiff has claimed that the availability of escorts during the construction of the DFWA south loop ductbank project affected their ability to maintain ideal productivity during construction. At the time of the project, the DFWA was the world's second busiest airport in terms of takeoffs and landings, and the third busiest for passengers. The airport had more than 2,500 daily flights by more than forty commercial airlines and, therefore, required all construction vehicles to be escorted onto and around the AOA. As noted above, the contract provided that "DFW Airport AO escorts may be limited. The Contractor should expect and plan for some delays in the movement of personnel, equipment, and material to and from the contract sites. Every effort will be made by the Contracting Officer to reduce impact to the construction." The contract further provided that "DFW[A] escort shall be required to cross active runways and taxiways." The contract also placed responsibility upon the RE for "coordinating all escorts." The escorts, however, were employees of the DFWA.

Mr. Robert Fureby testified that with four work crews on the AOA; a manhole crew, trenching crew, potholing crew, and boring crew, the plaintiff needed five or six escorts per day for the work to be done on the project. Mr. Robert Fureby stated that he expected the escort crews to be available for the various crews as needed, waiting brief periods of time while the escorts moved to the locations of the AOA where they were needed. Typically, escorts were needed at the beginning of the work shifts to escort the various crews and equipment to the work sites. Then, throughout the day, the members of the various work crews on the project required escorts to move off and on the AOA to retrieve additional construction materials or haul spoils from the excavating, trenching, and boring work.

When the project began, convoys of up to fifteen vehicles would be taken on the AOA by the escorts. In September 1994, the DFWA notified CO Ramsey that the individual escorts would be limited to escorting two vehicles per convoy onto the AOA. The reduction was caused by safety concerns with reduced visibility caused by the large convoys and heavy air traffic. As a result, it took longer for the work crews to get on to the AOA at the beginning of a work day. In the same period, in an effort to reduce the impact of the DFWA escort requirements to construction, the defendant sought and obtained permission from DFWA to qualify government employees, as well as other government contractors, to serve as the escorts on the project. The government escorts also provided inspection services for the defendant. The RE testified at trial that the escorts would inspect the progression of the construction and aid him in overseeing the project.

RE Colditz's testimony conflicted with the claim of the plaintiff that the availability of escorts caused the plaintiff problems or contributed to delay. The RE testified that escorts could be delayed on the project when coordinating with the officials at the DFWA. The escorts were required to get permission from the DFWA before moving on to the AOA and that was a source of delay, but the delay would not last more than five to ten minutes. The defendant, through the testimony of RE Colditz and CO Ramsey, stated that they never received complaints concerning the availability of escorts on the project. Representatives of the plaintiff, however, indicated at trial that the contractor had verbally complained to RE Colditz about the availability of escorts during the project and that the plaintiff was required to slow production rates, although the plaintiff did not offer any documentation of such complaints.

### C. ADDITIONAL UTILITIES ENCOUNTERED DURING CONSTRUCTION

Relying on the plans and specifications provided by the defendant, the plaintiff estimated that 194 utilities needed to be located before excavation. As required by the contract plans and specifications, the plaintiff was required to develop a map of existing cables and utilities, and once located, the plaintiff was required to take all measures necessary to accurately locate the routing of underground cable and utilities within the project areas to be excavated, trenched or drilled. The plaintiff had to locate underground cables and utilities by hand-digging or an alternative procedure approved by the RE.

The potholing crew was responsible for locating and mapping of the utilities ahead of the trenching crew and/or manhole excavation and installation crew. The potholing crew would broadband the presence of utilities. Once a utility was located, the potholing crew would excavate around the utility either completely by hand or partially by hand and with the use of an excavator. The potholing crew would then locate the depth of the utility and backfill it with sand, so when the trenching crew got to that point, they could relocate the utility with minimal effort. When the trenching crew reached the located utility they would slow down to prevent any damage to the utility. Once the trenching crew finished trenching around the utility, they would install the conduit which would house the fiber optic cable, pour concrete around the conduit, backfill the excavation with the excavated material, and compact the soil around the conduit and the located utility. If a manhole excavation crew was involved, they would proceed in a similar mode when working around the utilities.

Although, the plaintiff's bid estimate accounted for the 194 utilities, it distinguished between the utilities that were located above the project ductbank lines and those below the project ductbank lines. Mr. Robert Fureby testified that the utilities that were located below the project ductbank lines would require "caution in the excavation, but there wouldn't be any additional cost as it relates to the backfilling of those utilities. In a lot of cases those utilities were several feet below our excavation, so it didn't even impact our excavation."

The June 1, 1994 first submittal of contract items of work for progress payment purposes included item # 10, "Exploration Existing Utilities," at a quantity of 150 and a price of $1500 each. The attachment to the submittal included the definition of the Exploration Existing Utilities for progress payment purposes:

— to include locate and verify each utility, power, control or communication cable. Excavate and install split conduit as needed, supply certified electrician to accommodate lock-out and or remedial work as necessary. The above listed effort is accomplished as Stage 1. The Stage 2 effort includes lockouts, electrician standby, precautionary measures during mainline 8N4, 4N4, manhole, handhole, bore pit and receiving pit excavation and backfill, as per contract drawings and specifications. Reference Attachment A and B.

Mr. Robert Fureby testified that the reason the submittal of contract items of work for progress payment included 150 utilities and not 194 utilities was the remaining forty-four fell below the project ductbanks, and, therefore, the plaintiff did not have to consider those utilities when constructing the project. The $1500 claim for each of the 150 utilities was for compensation for the potholing and working around the utilities, and for excavation through backfill.

The plaintiff learned after the first or second day of utility exploration that the plans and specifications did not correspond to the actual location or to the actual number of utilities. On February 17, 1995, the plaintiff sent a letter to the RE regarding utility exploration expenses. The plaintiff enclosed a "Contractor's Worksheet itemizing the expenses incurred for utility exploration not included in the Scope of Work on Contract Number DTFA 07–94–C–03079, the South Loop Duct Bank System. Manuel Bros., Inc. requests a Change Order be prepared for these items." The accompanying Contractor's Worksheet specified additional charges per utility exploration to be $289.00. On

June 28, 1995, the plaintiff sent a letter to CO Ramsey stated that no resolution regarding the extra work associated with the additional utility exploration encountered on the project had occurred. The letter stated that as of June 28, 1995, the plaintiff "has encountered a total of (82) additional utility explorations necessary to complete the Contract work ... [t]he Contractor's Worksheet indicates the price for this work is $313.18 per exploration." The RE for the project responded to the June 28, 1995 letter on July 8, 1995 and stated:

> I am in receipt of your letter dated June 28, 1995 in regards to additional utility exploration cost. This letter is the same as that received on February 21, 1995. Upon review around February 28th, you verbally agreed to provide the government with documents clearly indicating those utility lines which the contractor encountered which were not shown on the drawings. Secondly, it is my understanding that the agreed upon cost per utility line would be $289.00. If I am incorrect, please advise. I will await further documentation before proceeding with any actions on this matter.

The plaintiff responded by letter dated July 10, 1995, stating that the contractor would reduce the costs of the additional utility exploration by deducting the cost for the electronic utility locator. In addition, the plaintiff stated that $289.00 per individual additional utility exploration was agreeable and the total additional utilities as of July 5, 1995, was eighty-six. On August 9, 1995, CO Ramsey conducted a meeting with the RE and plaintiff's representatives regarding all the problems, issues, and damages from the beginning of the project to date. The RE issued a change proposal request concerning the additional utilities as discussed at the August 9, 1995 meeting. The August 9, 1995 document titled change proposal request, stated that the contractor would receive $289.00 as the cost of exploration per utility location.

Mr. Gary Smith sent a letter to CO Ramsey on October 4, 1995, clarifying his understanding arising from the agreements proposed by CO Ramsey at the August 9, 1995 meeting. The letter detailed the plaintiff's understanding regarding the additional utility exploration:

> Also contributing to our productivity losses, and constituting an interference with our expected November, 1994, substantial completion date, was the great number of missing and improperly located utilities. While we have sought reimbursement for the direct costs associated with locating those utilities, we are still calculating the indirect costs, particularly as they relate to the significant productivity losses in the first several months of the project, which further contributed to our inability to substantially complete by November, 1994. The design errors/omissions which caused this problem are clearly the responsibility of the government.

On October 26, 1995, CO Ramsey responded to Mr. Smith's letter of October 4, 1995, stating that his understanding of the meeting held on August 9, 1995, was that all claims and requests for equitable adjustments had been discussed and agreed upon. CO Ramsey also stated that since the plaintiff's letter of October 4, 1995, did not reflect that understanding, the negotiations and agreements reached during the meeting were void.

The parties agreed that plaintiff had encountered ninety-one additional utilities that were not identified on the plans and specifications for the DFWA south ductbank loop project, and that the additional ninety-one utilities were materially different from what was shown on the plans and specifications for the project. Yet, they could not agree on the compensation that the plaintiff should receive. As a consequence, CO Ramsey issued unilateral Modification No. 0004 to the contract on March 21, 1996. The modification provided $26,299.00 for the ninety-one additional utilities encountered on the project, a price of $289.00 per utility.

### D. MANUEL BROTHERS INC.'S PRODUCTION RATE DURING THE PROJECT

The plaintiff and defendant agree that the plaintiff completed the contract within the contractual deadline, which included a sixty-day extension CO Ramsey granted in 1995.

Yet, the plaintiff states in its complaint that, but for the government caused delays, the plaintiff expected to complete the project by:

November of 1994 which would allow it to avoid the weather impacts of the winter season and eliminate the need to remain on the site for the 5 months of the winter season. MBI expected to return to the site in April and May of 1995 to complete surface restoration and seeding and to be totally complete by the end of May 1995. . . .

This timetable referred to by the plaintiff reflects the plaintiff's initial, proposed Progress Work Schedule submitted to the defendant on or about June 10, 1994. As noted above, the defendant rejected this proposed Progress Work Schedule and ultimately approved a second Progress Work Schedule on July 20, 1994, allowing for fifty-two weeks to complete the contract.

At trial, the plaintiff presented evidence that it intended to follow its first submitted proposed Progress Work Schedule that slated the majority of contract work to be completed in twenty-two weeks. Mr. Robert Fureby testified that he did not believe the DFWA south ductbank loop project to be difficult based on the experience of the plaintiff with other, more difficult construction projects. Mr. Smith testified that although there were many restrictions imposed because the project took place on the AOA, he felt that since the plaintiff took those restrictions into account when estimating its bid, "the job itself was not overly difficult. . . ." In fact, Mr. Smith testified that although the plaintiff submitted the revised work schedule, "all along we were attempting to complete that [the project] as we had scheduled it in the first schedule." Mr. Paul Manuel also testified regarding the early completion rate of the plaintiff:

Q: Did you have any discussions with anyone involved in the project prior to the start of the project, about the plan for how long the project was going to take?

A: There was a lot of discussion in our office . . . . There was a tremendous amount of discussion on how we would build the project within that one season.

Q: When you say within that one season, what do you mean?

A: It was our intention to complete that project, substantially complete that project in one season. If memory serves me, I think we had some restoration estimates figured to go back into that following 1995 year's, but all of the duct bank I think, as memory serves me, we were going to have completed that year, was our goal.

The defendant's records indicate that in October 1994, plaintiff was ahead of schedule for the completion of the project. Defendant's approval of the plaintiff's fourth progress payment indicates that the plaintiff had completed fifty-seven percent of the project by October 5, 1994. In comparison, the approved Progress Work Schedule submitted by the plaintiff indicated completion to be 35.46% by October 1994. Plaintiff's initially, proposed twenty-two week work schedule, disapproved by the defendant, would have had the plaintiff completing approximately sixty-seven percent in this same time period.

In addition to the apparent difficulties experienced by the plaintiff detailed in the preceding sections, the plaintiff experienced delay caused by the boring required under the INDIA taxiway of the DFWA. The contract specified that a 630 foot bore was required to install the fiber optic cable under the INDIA taxiway (India bore). Boring to install the fiber optic cable was required to prevent disruption to airport operations and Delta Airline's use of the INDIA taxiway that would have resulted if trenching was used. The India bore contract specifications included the required procedures for the bore to reduce the associated impacts the bore would have on airport operations. The plans and specifications for the project recommended that a directional bore be used for the India bore and the plaintiff bid the project anticipating the use of a directional bore. A directional bore allows the boring crew to direct the path of the bore as it is being drilled. The use of a directional bore creates a void after the bore is run through the ground and until casing is installed to support the void. The defendant required that the India bore work occur after September 6, 1994 and re-

quired continuous operation for a projected fourteen calendar days.

After contract award, the DFWA notified the defendant and the plaintiff that it would not allow the use of a directional bore for the India bore. The DFWA determined that a directional bore, with the resulting void created under the taxiway, would prevent the INDIA taxiway from being used by aircraft due to the danger the taxiway could collapse under the weight of the airplanes passing over. The defendant and the DFWA decided that the appropriate method for the completion of the India bore would be the use of an auger bore. Although an auger bore does not have the steering capabilities of a directional bore, an auger bore does not leave a void in the ground following the boring. As the auger bore is drilled, casing is installed in the boring hole as it progresses and, therefore, does not create the void that would have prevented the use of the INDIA taxiway.

On October 1, 1994, the plaintiff began boring. On October 6, 1994, the plaintiff notified the RE that the India bore was misaligned vertically. The vertical alignment of the bore had risen within three feet of the INDIA taxiway apron. Over the next several days, the plaintiff and the defendant held various meetings to discuss the best course of action to proceed with the India bore given the current vertical alignment of the bore. The plaintiff attempted various techniques to correct the vertical alignment, yet after discovering that the India bore was now eighteen to twenty-four inches from the INDIA taxiway apron, all production on the India bore ceased on October 9, 1994, as directed by the defendant.

CO Ramsey notified the plaintiff by letter dated October 17, 1994, that the:

> 485 feet of the 24 [inch] ductbank under taxi way India does not comply with the specifications for elevation and horizontal alignment. In lieu of rejecting the 485 feet and to mitigate the cost to your company, the government is willing to evaluate a plan submitted by your company to complete the ductbank under taxi way India.

CO Ramsey's letter was prompted by the failure of the plaintiff's auger bore to complete the India bore per the contract specifications.

From November 4, 1994 to March 29, 1995, the plaintiff submitted three proposals for the correction of the India bore. On April 27, 1995, the defendant approved the plaintiff's third proposal for the correction of the India bore which contemplated the use of an intercept bore. The intercept bore involved boring from the opposite side of the original bore, the removal of a portion of the INDIA taxiway apron, digging down to the failed bore and connecting the new boring tunnel with the failed tunnel. The plaintiff completed the India bore based on the intercept bore on June 3, 1995, almost eight months from the original date of the initial auger boring.

In addition to the delay caused by the India bore, the plaintiff accomplished limited results under the contract during the winter months of December 1994 thru April 1995. Originally, the plaintiff had requested a voluntary winter stand-down period of fourteen weeks through the winter of 1994–1995 in their first proposed Progress Work Schedule. The defendant, as noted, did not approve this schedule. At the beginning of the 1994–1995 winter, the plaintiff requested a winter stand-down due to the severe weather it encountered at the project site. The plaintiff orally requested the stand-down due to the cost of supplying the job site with men and materials when the weather prevented work from being completed. The defendant denied the request and the plaintiff's resources remained at the job site as required by the approved Progress Work Schedule. The plaintiff, however, reduced the number of employees at the project site during the winter months, maintaining a minimal number of workers in case the weather improved.

The winter months in the Dallas/Fort Worth area are normally moderate in terms of average annual rainfall. Indeed, based on the thirty year average, complied by the National Oceanic and Atmospheric Administration, the months of December, January, and February generally are the driest months in the Dallas/Fort Worth area. The winter of 1994–1995, however, proved to be an abnormal year for precipitation. The plaintiff lost approximately seventy work

days, and two days that required a reduced crew, to abnormally severe weather during the months of December 1994 and April 20, 1995, and the associated impact of the weather on the project site. As a result, of the approximately 102 available work days during this time period, the plaintiff was only able to use an estimated thirty-one percent of those days for project work due to the impact of the adverse weather. Following the winter months and the approval of the plaintiff's correction of the India bore, progress on the project site resumed substantially in early June of 1995. The plaintiff completed the project on October 4, 1995, within the contract deadline, which included the sixty-day extension provided by the defendant.

The plaintiff submitted its claim in the amount of $2,211,744.79 to CO Ramsey on April 8, 1996. The claim to the CO detailed five theories of recovery: 1) the plaintiff was entitled to finish the contract early and the defendant prevented it from doing so; 2) the defendant was responsible for design defects in the plans and specifications of the contract; 3) the defendant breached its implied duty to cooperate; 4) the plaintiff was entitled to recover for Type I and Type II differing site conditions; and 5) the plaintiff was denied and delayed project site access due to unavailability of escorts. CO Ramsey denied the plaintiff's claims in their entirety on Au-

gust 16, 1996. On December 9, 1996, CO Ramsey issued his final acceptance of all work under the contract. The notice of final acceptance and final payment of the contract included unilateral modification five.

Unilateral modification five was based on the plaintiff's failure to install ductbank lines one and three at the depth indicated on the plans and specifications of the contract. The failure of the plaintiff to install the ductbank according to the plans and specifications was a result of the plaintiff using their submitted VECP. The VECP, as noted above, proposed a slight change in the slope of the trenches that could result in a savings to the plaintiff and the government. CO Ramsey had rejected the VECP on August 12, 1994, yet he testified that he was informed by RE Colditz that the plaintiff had begun incorporating the VECP before he issued his rejection of the proposal.

Following the rejection of the VECP, CO Ramsey determined that the plaintiff had incorporated the VECP into part of lines one and three of the ductbank project. As part of the FAA's final acceptance of the work under the contract, CO Ramsey issued the unilateral modification that reduced the contract amount by $73,153.71 for the use of the VECP in those lines.[4]

---

4. For the first time, in the plaintiff's initial post-trial brief, the plaintiff alleges that "the Government back-charged MBI $73,000 for use of the value engineering proposal, .... This excess back-charge was improper and should be taken into account by this Court when determining damages to be awarded." The defendant claims that "MBI did not identify this theory of recovery in its complaint, and is thus barred from recovering based upon it now." In fact, MBI's claim to the contracting officer and the complaint filed in this case did not allege that contracting officer Ramsey's unilateral Modification No. 0005 was improper. The claim to Ramsey and the complaint in this case did not refer to the VECP, and did not request any monies related to the VECP. Nor has the plaintiff requested leave to amend its complaint. Because the plaintiff has not submitted a VECP claim to the contracting officer and did not allege the improper back charge in its complaint, the belated VECP claim is not properly before this court. See Santa Fe Eng'rs, Inc., v. United States, 818 F.2d 856, 858 (Fed.Cir.1987) ("It is now elementary that, for claims (such as those now before us) brought under the Contract

Disputes Act of 1978, the claim must be in writing and submitted to the contracting officer for a decision. 41 U.S.C. § 605(a)") (footnote omitted); Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed.Cir.1987) ("We know of no requirement in the Disputes Act that a 'claim' must be submitted in any particular form or use any particular wording. All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim."); Croman Corp. v. United States, 44 Fed. Cl. 796, 800 (1999) (On appeal, "the contractor may not raise any new claims not presented ... to the contracting officer.") Furthermore, though the Rules of the Court of Federal Claims provide for liberal pleading, the complaint still must state "a short and plain statement of the claim showing that the pleader is entitled to relief," and also a "demand for judgment for the relief" sought by the plaintiff. RCFC 8(a). This plaintiff has not done with respect to its belated VECP claim.

## DISCUSSION

After the trial of this matter, the plaintiff filed its post-trial brief, redefining and refining its claims for recovery as described in the complaint. The post-trial brief identified six legal theories arising under the contract. The plaintiff stated the following:

At the trial of this matter, MBI sought $2,196,381 for out-of-scope work that was required due to various changed conditions and breaches of contract by the Government.

MBI seeks recovery based on six legal theories:

1. MBI was entitled to finish the Project early but the Government interfered with MBI's right to finish the Project within five and one-half (5½) months;

2. The Government is responsible for design errors and the drawings were defective and failed to disclose utilities;

3. the Government had superior knowledge regarding the expansive clay;

4. the Government breached its imputed duty to cooperate;

5. the clay constituted a Type I Differing Site Condition; and

6. the clay constituted a Type II Differing Site Condition.

I. Government Design Errors and Defective Drawings Failed to Disclose Utilities

The plaintiff has claimed that when it bid the DFWA south ductbank loop project it based its bid estimate on the number of utilities shown on the construction drawings. The plaintiff appears to assert that the utilities indicated on the construction drawings were the utilities that the plaintiff was expected to locate during construction, but utilities that were not identified on the drawings were beyond the scope of the contract. The plaintiff claims that since the construction drawings misplaced or omitted ninety-one utilities, the plaintiff was required to perform extra work under the contract to locate and identify those utilities, and therefore, the construction drawings were defective and the government has breached its implied warranty of the construction drawings and specifications.

The defendant argues that the "contract placed the onus upon MBI to contact various parties who might have utilities in the area, to locate the additional utilities, and to generate a map of its findings." Therefore, according to the defendant, because the plaintiff was obligated under the contract to locate the utilities, the plaintiff "fails to state a claim upon which relief can be granted." Moreover, the defendant asserts that the plaintiff's claim for defective design specifications is without merit because the contract specifications informed the plaintiff that there were additional utilities not identified and placed the obligation of locating the additional utilities on the plaintiff.

The United States Court of Appeals for the Federal Circuit stated in *Jowett, Inc. v. United States* that:

In interpreting a contract, we begin with the plain language. We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning. In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense.

*Jowett, Inc. v. United States,* 234 F.3d 1365, 1368 (Fed.Cir.2000) (citations omitted).

The specifications of the DFWA south loop ductbank project addressed utilities under the following four provisions: 1) subsection 1.09(M)(5); 2) Appendix A, section 1.10, Underground Utility Location Procedures; 3) subsection 1.10(J); and 4) subsection 100–3.2, Electrical Work Provisions, Existing Underground Utilities. Initially, the contractor was required to follow the procedures under subsection 1.09(M)(5)(a) for establishing the location of the existing utilities. Under this subsection, the contractor was required to develop a utility and cable map to show all underground utilities. The map was to be comprised of utility information provided in a field survey, other utility information provided by the FAA, DFWA, telephone, electrical and other utility companies. The contract provided that "[i]t is the Contractor's responsibility to notify all utility companies as well as the Contracting Officer to ascertain that

they have all available as-built information." Additionally, the DFWA promulgated its own procedures for the plaintiff to follow when working around utilities in Appendix A, section 1.10, Underground Utility Location Procedures. These procedures required the plaintiff to follow similar methods for locating existing utilities under subsection 1.09(M)(5)(a), including a monthly utility meeting, which notified the various utility companies of MBI's planned excavation in the upcoming months.

Subsection 1.10(J)(3), instructed the contractor on the procedures required when working around utilities. The subsection allowed the contractor the discretion to determine the appropriate measures to "accurately locate the routing of underground cable and utilities within project areas to be excavated, trenched or drilled." In addition, subsection 1.10(J)(1), stated that the contractor shall coordinate contact with DFWA, the FAA, and all utilities regarding cable routes and utilities prior to excavation or digging and provide written documentation of how utility locations were verified.

■ Section 100–3.2, Electrical Work Provisions, Existing Underground Utilities, also addressed utility work required by the contractor. Section 100–3.2 stated the following:

> Per Item SS–G–500, "Existing Utility Exploration", it is the Contractor's responsibility to pinpoint underground lines to avoid unplanned disruptions or disturbing of installation or operation of underground lines in construction areas. The Contractor shall use cable tracing equipment or other methods approved by the RE at his disposal, to pinpoint line locations. Excavation shall not proceed until all underground lines have been identified to the satisfaction of the RE. (Emphasis in original).

The defendant did not include Section SS–G–500 in the solicitation given to prospective bidders. When the specifications contain an obvious void in a contract, an ambiguity can be created. See Interstate Gen. Gov't Contractors, Inc. v. Stone, 980 F.2d 1433, 1435 (Fed.Cir.1992) ("[A] patent ambiguity may manifest itself as an 'obvious omission, inconsistency or discrepancy of significance.' ")

(quoting Beacon Constr. Co. of Mass. v. United States, 161 Ct.Cl. 1, 7, 314 F.2d 501, 504 (1963)); In re Hart's Food Service, Inc., A.S.B.C.A. No. 30756, 30757, 89–2 B.C.A. (CCH) ¶ 21,789, 1989 WL 47610 (1989) ("We have held above that where there was a reference in one part of the contract to a non-existent provision or to pages or sections which are missing from the contract, these were patent ambiguities for which appellant should have made a pre-bid inquiry."). Cf. Interwest Constr. v. Brown, 29 F.3d 611, 616 (Fed.Cir.1994) ("By definition, an 'obvious void' or glaring omission can never be a latent ambiguity.").

The defendant conducted a pre-bid conference on January 12, 1994 at DFWA for the purpose of providing a question and answer session on the project. The bidders were required to submit questions regarding the solicitation on or before January 5, 1994. Contract clause, Explanation to Prospective Bidders, provided the following:

> Any prospective bidder desiring an explanation or interpretation of the solicitation, drawings, specifications, etc., must request it in writing soon enough to allow a reply to reach all prospective bidders before the submission of their bids. Oral explanations or instructions given before the award of a contract will not be binding. Any information given a prospective bidder concerning a solicitation will be furnished promptly to all other prospective bidders as an amendment to the solicitation, if that information is necessary in submitting bids or if the lack of it would be prejudicial to other prospective bidders.

Prior to the pre-bid conference, as required by the Explanation to Prospective Bidders clause, the defendant received a question regarding specification SS–G–500 because it was missing from the specifications. The defendant responded in the Answers to Solicitation Questions from Contractors, stating that "Existing Utility Exploration has been performed under a separate contract. The information will be made available as soon as possible."

When the defendant told prospective bidders in the Answers to Solicitation Questions from Contractors that utility exploration was

being performed under a separate contract, the government created further ambiguity with the previously indicated terms of the solicitation, and ultimately the contract.[5] Since the defendant's Answers to Solicitation Questions from Contractors instructed the potential bidders that "Existing Utility Exploration has been performed under a separate contract," and subsection 1.09(M)(5) of the solicitation informed the potential bidders of the procedures "that shall be adhered to by the Contractor in establishing the locations of existing utilities," an ambiguity was created in the solicitation documents issued by the defendant. The ambiguity created was the scope of the work regarding the exploration of the known, unknown or misplaced utilities.

The United States Court of Appeals for the Federal Circuit has written:

> If ambiguity is found, or if ambiguity has arisen during performance of the agreement, the judicial role is to implement the intent of the parties at the time the agreement was made. In so doing the words used by the parties to express their agreement are given their ordinary meaning, unless it is established that the parties mutually intended and agreed to some alternative meaning. The paramount focus is the intention of the parties at the time of contracting; that intention controls in any subsequent dispute.

*King v. Dep't of the Navy*, 130 F.3d 1031, 1033 (Fed.Cir.1997) (citations omitted); *see also Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed.Cir.1986) ("It is the general law of contracts that in construing ambiguous and indefinite contracts, the courts will look to the construction the

parties have given to the instrument by their conduct before a controversy arises.") (citations omitted); *Atchison, Topeka and Santa Fe Ry. Co. v. United States*, 216 Ct.Cl. 54, 65, 572 F.2d 843, 849 (1978) ("It is axiomatic that the intent of the parties is controlling, and such intent is to be gathered from the whole of the documents involved.") (footnotes omitted).

Moreover, "[t]he court can look at all the relevant circumstances surrounding the transaction to discover the parties' underlying intention, including the conduct of the parties before the advent of the controversy, oral statements, writings, the recitals to a contract, prior negotiations, and other conduct by which the parties manifested their assent." *KMS Fusion, Inc. v. United States*, 36 Fed.Cl. 68, 77 (1996), (citations omitted), *aff'd*, 108 F.3d 1393, 1997 WL 101701 (Fed. Cir.1997); *see also Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1058 (Fed.Cir.), *cert. denied*, 464 U.S. 814, 104 S.Ct. 68, 78 L.Ed.2d 83 (1983) ("A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy."); *Macke Co. v. United States*, 199 Ct.Cl. 552, 556, 467 F.2d 1323, 1325 (1972) ("The case is an excellent specimen of the truism that how the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement by itself. We are, of course, entirely justified in relying on this material to discover the parties' underlying intention."); *Omni Corp. v. United States*, 41 Fed.Cl. 585, 591 (1998) ("It is a familiar principle of contract law that the parties' contemporaneous construction of an agreement, before it has

---

**5.** The United States Court of Claims in *Manloading & Management Associates, Inc. v. United States*, addressed answers provided by the government at pre-bid conferences and stated:

> The court was recently confronted with a somewhat similar factual situation in which the Government attempted to negate an oral understanding or agreement reached at a bidders' conference. In rejecting defendant's argument in that case, the opinion stated:
> To hold that the writing signed following such a conference as here took place negates the oral agreement reached at the conference would be reckless of the reputation of the

procurement system in which bidders' conferences are an integral part. Meetings between Government procurement officers and prospective bidders would become a sham. Questions would be useless, for answers would be without force, and the amounts of the bids received would soon show the results. Respect for the answer is required by the respect given the Government's procurement process. *Manloading & Mgmt. Assocs., Inc. v. United States*, 198 Ct.Cl. 628, 635–36, 461 F.2d 1299, 1302–03 (1972) (quoting *Sylvania Elec. Prods., Inc. v. United States*, 198 Ct.Cl. 106, 131, 458 F.2d 994, 1008 (1972)).

become the subject of a dispute, is entitled to great weight in its interpretation.") (citation omitted).

At trial, Mr. Robert Fureby testified regarding his understanding of the plaintiff's obligation for locating utilities when he prepared the plaintiff's bid for the DFWA south loop ductbank project as follows:

Q: Did you believe, at the time you prepared the estimate, that Manuel Brothers would have to find and locate utilities that were not on the construction drawings?

A: No.

Q: Why did you hold that belief?

A: I believed that what was on the drawings had been taken off as built records of the DFW airport, and that it was inclusive.

Q: Did you believe it was inclusive because the government had retained someone else to find all the utilities?

A: No.

Q: Why did you believe it was all inclusive?

A: I assumed that when they prepared the drawings that they had gotten the as built drawings from other projects and all of those utilities would have been shown on the drawings.

On June 1, 1994, the plaintiff submitted for approval a list of contracted items of work for progress payment purposes. The attachment to the letter indicated 150 existing utilities for exploration and detailed the work to be performed for locating the utilities. The work included locating and verifying the existing utilities. According to Mr. Robert Fureby's testimony, the 150 utilities for the contracted work items differs from the plaintiff's bid of 194 utilities to locate because approximately forty-seven of the utilities were below the ductbank structure as reflected in the construction drawings. The plaintiff's understanding of the scope of work for locating additional utilities was communicated to the plaintiff in two letters sent to the defendant. On February 17, 1995, the plaintiff sent a letter to the RE enclosing "a Contractor's Worksheet itemizing the expenses incurred for utility exploration not included in the Scope of Work" of the DFWA south loop ductbank project. On June 28,

1995, the plaintiff again notified the defendant of the need to resolve the extra work associated with the additional utility exploration encountered on the jobsite. The June 28, 1995 letter stated:

To date the Contractor has encountered a total of (82) additional utility explorations necessary to complete the Contract work. These separate locations have been documented and signed by the FAA inspector and can be provided on request by the FAA.

The defendant's RE on the project responded to the June 28, 1995 letter on July 8, 1995, acknowledging the receipt of the plaintiff's letters and requesting documentation "indicating those utility lines which the contractor encountered which were not shown on the drawings. Secondly, it is my understanding that the agreed upon cost per utility line would be $289.00." Based on the correspondence between the parties, on August 9, 1995, the defendant, through the RE, issued Change Proposal Request No. 19, which stated the following:

Contractor shall receive money for additional utility exploration work. Value of exploration per location was agreed to at $289 as stated in MBI's letter of July 10, 1995. Other letters which were about this same issue are noted as MBI's two letters of June 28 and another one on July 10, 1995. Contractor shall provide documentation for discovered utilities.

The plaintiff refused to sign Change Proposal Request due solely to a dispute over the amount of compensation for the cost of locating additional utilities and CO Ramsey subsequently issued a unilateral modification under the Changes clause of the contract. The purpose of the unilateral modification was to incorporate Change Proposal Request No. 19 into the contract. The contract price was increased by $26,299.00, a rate of $289.00 per additional utility.

The defendant stated in its post-trial brief that "MBI cannot as a matter of law recover for performing a task *it had a contractual obligation* to achieve." (Emphasis in the original). The defendant, however, ignores the intent of the parties and their under-

standing of the scope of the work that the plaintiff was obligated to perform under the contract. The plaintiff reasonably relied on the contract documents to determine the amount of work it was required to perform and based its bid on that information. The defendant's RE and CO on the DFWA south loop ductbank project recognized, as evidenced by their correspondence with the plaintiff and ultimately in the unilateral contract modification that compensated the plaintiff for the extra work, that the plaintiff was not required to locate additional unknown utilities. Moreover, as the Answers to Solicitation Questions from Contractors stated, utility exploration was to be performed under a separate contract and CO Ramsey testified during cross-examination that the separate contract for locating existing utilities was the responsibility of another contractor.

However, the plaintiff's complaint in this court does not request damages based on the cost associated with locating individual, unknown or misplaced utilities, for which the plaintiff was compensated. The plaintiff's complaint requests this court to award damages based on a delay claim using a modified total cost method or total overrun method, seeking labor productivity losses of $703,547.79, extended field overhead costs of $1,281,292.00, extended home office overhead of $226,906.00, and changed conditions of $540,261.00, less those actions that are questionable.[6] Essentially, it appears that after receiving compensation for the cost of locating additional and unknown utilities, plaintiff's theory of recovery is based on damages it claims for delays associated with having to locate the additional utilities. Therefore, plaintiff's recovery, if any, associated with the additional, unknown or misplaced utilities can only be awarded as part of the plaintiff's delay claim, which uses a modified total cost method or total overrun method.

## II. Government had Superior Knowledge Regarding the Expansive Clay

The plaintiff alleges that the defendant breached the contract for "failing to disclose its superior knowledge concerning the existence of expansive clay soils on the Project Site." Specifically, the plaintiff has alleged the following: 1) the defendant possessed superior knowledge concerning expansive clay soils that was vital to the plaintiff's performance of the contract; 2) the plaintiff did not know of the expansive clay soils at the project site; 3) the expansive clay soils information was not "reasonably available" to the plaintiff; 4) the defendant has conceded that it failed to disclose expansive clay soils information to the plaintiff; and 5) the plaintiff was misled by the defendant's failure to disclose its superior knowledge concerning expansive clay soils.

### A. Jurisdiction

The defendant, refuting the claim that it breached the contract by withholding superior knowledge of the expansive clay soils, also has challenged this court's jurisdiction of the plaintiff's superior knowledge claim. The defendant has alleged that pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 601–613 (1976 & Supp. II 1978), because the plaintiff never presented a breach of contract claim based on the government's superior knowledge of expansive clay soils at the work site to the CO, this court is precluded from considering the claim. The defendant asserts, therefore, that adjudication of the plaintiff's superior knowledge claim would bypass the statutory role of the contracting officer to review a contractor's claim for recovery.

Although the plaintiff characterizes the defendant's challenge of subject matter jurisdiction as incredible and late, "challenges to subject matter jurisdiction are appropriate at any stage." *Fugere v. Derwinski*, 972 F.2d 331, 334 n. 5 (Fed.Cir.), *reh'g en banc denied* (1992); *Newport News Shipbuilding and Dry Dock Co. v. Garrett*, 6 F.3d 1547, 1553 (Fed.Cir.1993) *reh'd denied* (1994) ("[A] party may challenge the subject matter jurisdiction of a federal tribunal at any time."); *Phillips v. Gen. Servs. Admin.*, 924 F.2d 1577, 1579 (Fed.Cir.1991) ("A jurisdictional matter can be raised at any stage of a judi-

---

6. The Court notes that the number and categories of damages in plaintiff's complaint and plaintiff's post-trial briefs are somewhat inconsistent.

cial proceeding by any party or by the court on its own motion.").

Pursuant to the CDA, in lieu of appealing a decision of the contracting officer to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims. *See* 41 U.S.C. § 609(a)(1) (1994). The CDA grants the Court of Federal Claims jurisdiction over actions brought within twelve months of a contracting officer's decision. *See* 41 U.S.C. § 609(a)(3); *James M. Ellett Constr. Co., Inc. v. United States*, 93 F.3d 1537, 1541 (Fed.Cir.1996). Prior to a claim being brought to this court, however, a contractor must certify its claim to the contracting officer. *See* 41 U.S.C. § 605(a) ("All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision."); *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575 (Fed.Cir.), *reh'g denied* (1995) (holding that FAR 33.201 sets forth the three requirements of a claim as follows: "(1) a written demand, (2) seeking, as a matter of right, (3) the payment of money in a sum certain.").

The CDA does not require that a claim submitted to the contracting officer be in any particular form or use any particular language. *See Contract Cleaning Maint., Inc. v. United States*, 811 F.2d at 592. "All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and the amount of the claim." *Id.* The Court of Federal Claims has jurisdiction over the claim after the CO has issued a final decision on the claim. *See James M. Ellett Constr. Co., Inc. v. United States*, 93 F.3d at 1542.

The plaintiff submitted its claim to the contracting officer on or about April 8, 1996. The claim sought "the payment of $2,211,744.79 for out-of-scope work required by the occurrence of various changed conditions and breaches of contract by the Government." The plaintiff's claim detailed five changed conditions and breaches of contract allegedly committed by the defendant. The plaintiff did not include the term superior knowledge of clay soils at the project site as one of the five changed conditions or breaches of contract, although the claim to the CO did list "Differing site conditions in the form of clay and rock." CO Ramsey denied the plaintiff's claim in his final decision dated August 16, 1996. In the plaintiff's complaint to this court, the plaintiff alleges that "[t]he Government's breaches of its contractual and other obligations, include, but are not limited to ... failing to disclose its superior knowledge as to the true soil conditions at the site." The plaintiff's complaint also requested the court to enter a judgement for money damages in the amount of $2,211,744.79.

The United States Court of Appeals for the Federal Circuit and the United States Court of Federal Claims have considered three factors when addressing a challenge to the Court of Federal Claims jurisdiction over a claim submitted to the CO. First, the Federal Circuit in *Placeway Construction Corp. v. United States*, wrote: "The court should have determined whether one or more claims existed, regardless of the form in which they were presented to the CO; the court should have decided this question based on whether all claims presented to the CO arose from a common or related set of operative facts." *Placeway Constr. Corp. v. United States*, 920 F.2d 903, 908 (Fed.Cir.1990). Second, the Federal Circuit in *Reliance Insurance Co. v. United States*, examined the nature of the complaint brought before the CO and the court, and found that when a contractor only submits a claim for an equitable adjustment to the CO and never claims a breach of contract, a trial court does not have jurisdiction to consider a breach of contract claim brought to the trial court under the CDA, because "the Government has not waived its sovereign immunity with respect to any breach claims." *Reliance Ins. Co. v. United States*, 931 F.2d at 866. *See also City of Tacoma, Dept. of Pub. Utils. v. United States*, 31 F.3d 1130, 1134–35 (Fed.Cir.1994) (finding the plaintiff's attempt to invalidate the contract based on the termination clause not reviewable since in its certified claim to the contracting officer it never challenged the validity of the termination clause). The court in *Scott Timber Co. v. United States*, provided an additional factor courts should

consider when addressing a challenge to the Court of Federal Claims jurisdiction over a claim submitted to the CO. *Scott Timber Co. v. United States,* 40 Fed.Cl. 492, 499–500 (1998), *vacated on other grounds by* 44 Fed. Cl. 170 (1999). The *Scott Timber Co.* court found jurisdiction when the contractor satisfied the factors above, even if the claims before the court contained slightly different legal arguments and the relief sought before the court was the same relief sought in the plaintiff's claim to the CO. *Scott Timber Co. v. United States,* 40 Fed.Cl. at 499–500.

■ Consequently, when a challenge is brought to the Court of Federal Claims jurisdiction over a claim submitted to the CO, the court should consider whether the claim is based on the same common or related set of operative facts brought before the CO, the legal theory underlying the claim remains the same as presented to the CO, and the complaint requests the same relief as requested from the CO. The court in *Johnson Controls World Services, Inc. v. United States,* addressed a challenge to the Court of Federal Claims jurisdiction over a claim submitted to the CO as follows:

> The court in *Scott Timber* acknowledged that "plaintiff's claim before this court contains slightly different legal arguments than the claims plaintiff submitted to the [contracting officer]," but concluded that plaintiff's claim in litigation was based on essentially the same legal theory, sought the same relief, and arose from the same set of operative facts. *Scott Timber,* 40 Fed.Cl. at 499.... Thus, for the purpose of determining whether a claim presented to the contracting officer is the same as that before the court, these cases addressed whether such claim is based on the same underlying theory, seeks the same relief, and arises from the same operative facts.

*Johnson Controls World Servs., Inc. v. United States,* 43 Fed.Cl. 589, 594 (1999). The court in *Johnson Controls World Services* found that the legal theories underlying the defendant's counterclaims were distinct from the claims presented to the CO, and, therefore, the court did not have jurisdiction over the claims. *Id.* at 595; *see also ECC Int'l Corp. v. United States,* 43 Fed.Cl. 359, 367 n. 6 (1999) ("[P]laintiff's claim does not merely augment the legal theories presented to the contracting officer. Plaintiff's claim relies on facts ... that were never presented to the contracting officer and never addressed in a final decision."); *Thermocor, Inc. v. United States,* 35 Fed.Cl. 480, 489–90 (1996) (finding that the court had jurisdiction over augmented legal theories of recovery, because it had not changed the essence of the claim, and the plaintiff had requested the same relief, therefore, the defendant was not prejudiced); *Solar Turbines, Inc. v. United States,* 26 Cl.Ct. 1249, 1259–60 (1992), *aff'd* 114 F.3d 1206, 1997 WL 291971 (1997) (finding jurisdictional requirements met when the "November 14, 1986, claim provided adequate notice to support the six remaining counts of the complaint. The instant counts essentially are variations and amplifications of the November 14, 1986, claim, updated so as to include facts that were unknown to plaintiff at the time of the claim and were uncovered during the course of discovery in this action.").

■ In the claim before the CO, the plaintiff alleged that the defendant breached the contract, but did not explicitly include an articulated superior knowledge claim regarding the clay soils at the project site as a basis of the breach. In the claim to the CO, the plaintiff, however, did discuss the defendant's knowledge of the condition of the soils and wrote about how the defendant allegedly withheld that knowledge.[7] The plaintiff has based its claim in this court, that the defendant breached the contract and withheld superior knowledge of clay soils at the project site, on the same set of operative facts as brought to the CO. As in the complaint, the

---

7. For example, the plaintiff's claim to CO Ramsey stated the following: "[I]t has become clear that the Government knew better and in fact knew that clay was present throughout the site but did not reveal that information to the contractors," "[c]learly, the clay was known to the Government and its design professionals;" "the Project was designed with knowledge of the clay ...," and "the Government's direct and clear representation that MBI should assume normal dirt constituted an unequivocal and clear representation that clay and rock conditions did not exist on the site."

plaintiff alleged in its claim to the CO that the defendant knew about the clay soils when it designed the project, the defendant did not reveal that knowledge to the plaintiff and that the defendant knew the plaintiff did not know of the clay soils and that the plaintiff relied on the "normal soils" information the defendant allegedly provided to the plaintiff. Moreover, the plaintiff has requested the same recovery arising from the alleged contract breach in its complaint and its claim to the CO.

Because the plaintiff's claim to the CO and its complaint allege a breach of contract, the plaintiff's claim to the CO and the complaint filed in this litigation are based on the same set of operative facts, and the plaintiff has requested the same relief in this case and its claim to the CO, this court has jurisdiction to consider the plaintiff's claim that the defendant breached the contract by withholding superior knowledge of the clay soils at the project site. The plaintiff, in its complaint, has merely augmented or changed the nomenclature of its claim that the defendant breached the contract by its failure to disclose its superior knowledge of the clay soils at the project site. *See Cerberonics, Inc. v. United States*, 13 Cl.Ct. 415, 418–19 (1987) ("[N]either the language of plaintiff's complaint nor its explanation of this action in accompanying briefs and at oral argument indicate that it is based on a different set of operative facts or seeks different categories of relief.... As such, plaintiff's complaint augments the legal theories underlying its claim. But it does not change the essence of that claim ....").

### B. Merits of the Plaintiff's Superior Knowledge Claim

The plaintiff alleges that the "Government also breached the Contract in failing to disclose its superior knowledge concerning the existence of expansive clay soils on the Project Site." The plaintiff asserts that "when the Government possesses special knowledge that is vital to the performance of the contract, but that knowledge is not shared by the contractor, the Government has an affirmative duty to disclose such knowledge." The plaintiff concludes that since "the Gov-

ernment failed to disclose its superior knowledge concerning the expansive clay soils at the Project Site, it breached its contract with MBI."

■■■ "The superior knowledge doctrine imposes upon a contracting agency an implied duty to disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance." *Giesler v. United States*, 232 F.3d 864, 876 (Fed.Cir.2000). If the government fails to disclose superior knowledge, the government will be in breach of its contractual obligations and the contractor may recover costs when the withholding of superior knowledge by the government makes it more difficult to perform under the terms of the contract. *See Hercules Inc. v. United States*, 24 F.3d 188, 196–97 (Fed.Cir. 1994) *aff'd*, 516 U.S. 417, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996). "Likewise, this court has granted relief where the government failed to reveal vital information not readily available concerning site conditions which would increase the contractor's costs.... It is, however, reasonable for the government to assume that a contractor is the best judge of its competency and will exercise good judgment in deciding to bid on a contract." *Am. Ship Bldg. Co. v. United States*, 228 Ct.Cl. 220, 225, 654 F.2d 75, 79 (1981) (citations omitted). Although a contractor may be able to recover from the government when it has established the factors of the superior knowledge doctrine, "the corollary of the [superior knowledge] rule is that the Government is under no duty to volunteer information in its files if the contractor can reasonably be expected to seek and obtain the facts elsewhere ...." *H.N. Bailey & Assocs. v. United States*, 196 Ct.Cl. 166, 178, 449 F.2d 376, 383 (1971); *see also Giesler v. United States*, 232 F.3d at 877 ("Because [the plaintiff] could have readily obtained this information, the government was not obliged to volunteer it."). In fact, "[p]laintiff does not have an action for breach of contract unless it can prove that the alleged withholding of information in this case, in fact, misled plaintiff. If plaintiff knew or should have known that it would encounter such a[ ] condition, it cannot be said plaintiff was misled." *McCormick Constr. Co., Inc. v. United States*, 18 Cl.Ct.

259, 266 (1989), (citations omitted), *aff'd* 907 F.2d 159, 1990 WL 93386 (1990).

█ The parties agree that the DFWA south loop ductbank project solicitation, specifications, and drawings were silent as to the type of soil at the project site. The parties also agree that the defendant knew at the time of preparing the design of the project that clay soils were extensively present at DFWA. The parties disagree, however, as to whether the defendant had an obligation to disclose this information to the plaintiff.

The plaintiff has alleged that the government possessed information which was unknown or not reasonably available to the plaintiff. At trial, the plaintiff presented the expert testimony of Mr. William Brumund, a registered engineer in nineteen states with over twenty-eight years of geotechnical engineering experience, specifically consulting on the design and execution of civil engineering projects. Mr. Brumund testified that in his experience, if a contract does not specify soil information, a contractor has three options. The contractor must decide whether to bid the project and assume the risk of the type of soil, consult geological sources available and determine the type of soil, or retain geotechnical engineers during the bid process to advise the contractor on the contract site conditions and help the contractor prepare the bid.

The defendant called Mr. Garry Gregory to provide expert testimony regarding the availability of soil information at the DFWA. Mr. Gregory, a civil engineer with over thirty years of experience, specializing in geotechnical engineering for approximately twenty years, is a licensed professional engineer in the State of Texas. Mr. Gregory testified that he consulted the soil survey maps of Dallas and Tarrant Counties, Texas, published by the United States Department of Agriculture and available in public libraries, the Dallas Sheet of the Geological Atlas of Texas, available from local map stores throughout the Dallas/Fort Worth area, and previous boring data developed during the initial construction of DFWA, and available from the DFWA document center. Mr. Gregory further testified that the information received by the DFWA document center regarding

the boring data information was provided at no charge. Mr. Gregory testified that a simple examination of these resources indicated that the type of soil surrounding the DFWA is "clay and shale, some shale underlying, in numerous borings, underlying the [ ] clay."

The plaintiff cannot show that the defendant has breached the contract by withholding superior knowledge of the clay soils at DFWA. Although the defendant had knowledge of the clay soils, the plaintiff has not shown that the same information was not readily obtainable by the plaintiff from another source. "This was not a situation where the defendant alone had superior knowledge of a material fact which it withheld from the plaintiff, and which it knew plaintiff required to intelligently appraise contract expenditures." *Ambrose–Augusterfer Corp. v. United States*, 184 Ct.Cl. 18, 38, 394 F.2d 536, 547–48 (1968). The expert testimony received at trial indicated there were numerous sources for information regarding the soil conditions at DFWA and, therefore, the knowledge of clay soils held by the defendant cannot be deemed unavailable. *See Giesler v. United States*, 232 F.3d at 876 ("The superior knowledge doctrine imposes upon a contracting agency an implied duty to disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance."). Therefore, the superior knowledge doctrine is inapplicable since the plaintiff had numerous sources of information available regarding the soil condition at the DFWA that it chose not to consult. *See H.N. Bailey & Assocs. v. United States*, 196 Ct.Cl. at 178, 449 F.2d at 383 (declining to apply the superior knowledge doctrine where the information necessary to perform the contract was obtainable from numerous sources other than the defendant).

III. Government's Misrepresented the Soil Conditions at the Project Site

The plaintiff has claimed that the alleged misrepresentation of normal soils by CO Tressler breached the contract when the defendant "fail[ed] to clarify the misimpression created by its representation that the soil conditions were normal." The plaintiff al-

leges that Mr. Robert Fureby asked CO Tressler at the pre-bid conference how a contractor should bid the project when no soil information was contained in the solicitation. The plaintiff states that CO Tressler orally instructed Mr. Robert Fureby to bid the project assuming normal soils. The plaintiff asserts that it was reasonable for MBI to rely on the purported statements of CO Tressler and further investigation regarding the soils at DFWA was unwarranted. In fact, according to the plaintiff, "MBI was discouraged from seeking additional information about the soil conditions due to comments about the soils made by the contracting officer."

"While the Court of Claims has held that claims of negligent misrepresentation or wrongful inducement sound in tort. *Somali [Dev. Bank v. United States*, 205 Ct.Cl. 741, 749, 508 F.2d 817, 821 (1974) ]. It is equally clear from the precedent of our predecessor court that, where there is privity of contract, misrepresentation has a contract aspect in addition to its tort aspect." *Morris v. United States*, 33 Fed.Cl. 733, 744 (1995) (citing *Florida Keys Aqueduct Auth. v. United States*, 231 Ct.Cl. 911, 912, 1982 WL 25805 (1982)).

With respect to tort claims, the Court of Federal Claims does not have jurisdiction. *see* 28 U.S.C. § 1491(a)(1) (1994); *Keene Corp. v. United States*, 508 U.S. 200, 214, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993) ("[T]ort cases are outside the jurisdiction of the Court of Federal Claims."); *Alves v. United States*, 133 F.3d 1454, 1459 (Fed.Cir.1998); *Brown v. United States*, 105 F.3d 621, 623 (Fed.Cir.) *reh'g denied* (1997); *Golden Pacific Bancorp v. United States*, 15 F.3d 1066, 1070 n. 8 (Fed.Cir.), *cert. denied*, 513 U.S. 961, 115 S.Ct. 420, 130 L.Ed.2d 335 (1994); *D.F.K. Enters., Inc. v. United States*, 45 Fed.Cl. 280, 284 (1999).

■ A government contractor, however, may recover damages when the contractor reasonable relies on incorrect representations made by the government in entering into a contract. *See Morris v. United States*,

33 Fed.Cl. at 744. "In its contract aspect, a claim of misrepresentation is in large measure analogous to a claim for breach of warranty." *Id.* Nonetheless, the plaintiff's claim of misrepresentation cannot stand since the plaintiff cannot identify a provision in the contract that misled the plaintiff. *See T. Brown Constrs., Inc. v. Pena*, 132 F.3d 724, 728 (Fed.Cir.1997), *reh'g denied* (1998) ("A contractor can recover damages under a contract for a misrepresentation by the Government in the contract documents.").

■ Although, as noted above, the contract is silent an the conditions of soil, the plaintiff argues that the statements allegedly made by CO Tressler, which she testified she did not remember making, regarding normal soils were incorporated into the contract. The plaintiff asserts the representations made by CO Tressler became part of the contract based on the Order of Precedence clause, located in Part I, Section G, Clause G–1 of the solicitation and the contract. The Order of Precedence clause states that "representations and other instructions" will be given precedence over contract clauses, project specifications, project drawings, and other documents, exhibits and attachments. The plaintiff contends that the alleged oral statements of CO Tressler that soil conditions at the project site were normal became incorporated into the contract as "representations and other instructions" referred to in the Order of Precedence clause, and that, therefore, the plaintiff was justified in relying on Ms. Tressler's statements. The Order of Precedence clause is "relied on to resolve a discrepancy between the specifications and drawings even though the discrepancy is known to the contractor prior to bid or is patent." *Hensel Phelps Constr. Co. v. United States*, 886 F.2d 1296, 1299 (Fed.Cir.1989); *see also Apollo Sheet Metal, Inc. v. United States*, 44 Fed.Cl. 210, 213 (1999). The plaintiff does not argue there was a discrepancy between the specifications and drawings of the solicitation.

The alleged oral statements regarding normal soils, if made,[8] at the pre-bid conference,

---

8. The court recognizes that although there is conflicting testimony by several witnesses on ei-

ther side, after listening to the witnesses, there is a real possibility, but not a proven certainty, that

however, were not incorporated into the contract and should not have been relied on by the plaintiff when preparing its bid by the plain language of the Explanation to Prospective Bidders clause, which states, in relevant part:

> Any prospective bidder desiring an explanation or interpretation of the solicitation, drawings, specifications, etc., must request it in writing soon enough to allow a reply to reach all prospective bidders before the submission of their bids. Oral explanations or instructions given before the award of a contract will not be binding.

Additionally, the contract contained the Site Investigation and Conditions Affecting Work clause, which provides the following:

> (b) The Government assumes no responsibility for any conclusions or interpretations made by the Contractor based on the information made available by the Government. Nor does the Government assumes responsibility for any understanding reached or representations made concerning conditions which can affect the work by any of its officers or agents before the execution of this contract, unless that understanding or representation is expressly stated in this contract.

In sum, the plaintiff cannot rely on the statements allegedly made by CO Tressler because those statements were never incorporated into the contract. The Order of Precedence clause generally is relied on to resolve conflicts between clauses of the contract. Unincorporated oral statements, even by the contracting officer, do not achieve contract language status. Moreover, explicit provisions in the solicitation advised the plaintiff that oral statements provided at the pre-bid conference were non-binding.

IV. The Government Breached its Implied Duty to Cooperate

In the claim to the CO, the plaintiff alleged that the defendant breached its implied duty to cooperate. The plaintiff alleged in its claim to CO Ramsey that the defendant failed to provide sufficient escorts and that

the defendant's denial of extended work hours breached the defendant's duty to cooperate and resulted in disruption and delay of work for which the defendant is liable. The plaintiff stated in its complaint that the defendant breached the contract by "failing to provide sufficient escorts into the AOA so as not to unduly restrict MBI's access to work areas." The plaintiff also alleged in the complaint that "the Government failed to provide a sufficient number of escorts to enable MBI to work in accordance with its expected sequencing of operations. Specifically, the Government's failure to provide escorts continually caused restricted access to the AOA for materials, equipment and personnel."

A. Jurisdiction

■ The defendant has challenged the court's jurisdiction of plaintiff's claim that the defendant breached its implied duty to cooperate. The defendant alleges that "MBI has raised this new theory of recovery too late, as it failed to present it to the contracting officer for a final decision." The defendant states that "MBI is barred from presenting it [breach of the implied duty to cooperate] for the first time in its post-trial brief."

As discussed above, the CDA grants the Court of Federal Claims jurisdiction over actions brought within twelve months of a contracting officer's decision. *See* 41 U.S.C. § 609(a); *James M. Ellett Constr. Co., Inc. v. United States*, 93 F.3d at 1541. Prior to a claim being brought to this court, however, a contractor must certify its claim to the contracting officer. *See* 41 U.S.C. § 605(a). MBI's claim to the CO specifically alleged that the defendant breached the contract by failing to provide sufficient escorts and by denying requests for extended work hours. The plaintiff has not altered its theory of recovery before this court. The plaintiff has alleged before this court that the "Government specifically promised that it would use its every effort to avoid disruption to the contractor's work and yet failed to fulfill this representation. Additionally, MBI's re-

the statements were made. Nonetheless, for purposes of a decision in this case, a determination

in this regard is not necessary.

quests for extended work hours were reasonable and should have been granted by the Government." The plaintiff's claim to the CO was clear and unequivocal, it also relies on the same set of operative facts and alleges the same amount in damages that is included in the complaint before this court. The court has jurisdiction over the plaintiff's claim that the defendant breached its implied duty to cooperate. *See Contract Cleaning Maint., Inc. v. United States,* 811 F.2d at 592 ("All that is required [for jurisdiction] is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim.").

### B. Merits of the Breach of Implied Duty to Cooperate Claim

■ The plaintiff has claimed that the defendant has breached its implied duty to cooperate. In fact, there is an "implied provision of every contract, whether it be one between individuals or between an individual and the Government, that neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance." *Lewis–Nicholson, Inc. v. United States,* 213 Ct.Cl. 192, 204, 550 F.2d 26, 32 (1977) (citations omitted). Not only must the government not breach this implied provision, the government "must do whatever is necessary to enable the contractor to perform." *Id.* (citations omitted). If the government's delay in providing materials or finishing work stems from its failure to do what is necessary to allow the contractor to perform:

> [I]t will have to respond in damages for the resulting additional outlays which are proved to have been caused the contractor. Under this principle, the plaintiff cannot prevail merely by proving that there was a lapse of time in receiving materials or even that the defendant was the source of that lapse. The lapse of time must be tied to the defendant's breach of its obligation of reasonable cooperation. The nature and scope of that responsibility is to be gathered from the particular contract, its context, and its surrounding circumstances. Once a breach of this type has been estab-

lished, the contractor must still show, as in all contract cases, that damage ensued.

*Commerce Int'l Co. v. United States,* 167 Ct.Cl. 529, 536, 338 F.2d 81, 85 (1964) (citations omitted).

■ In *Precision Pine & Timber, Inc. v. United States,* the United States Court of Federal Claims elaborated on the implied duty not to prevent, hinder or delay performance in a government contract. *Precision Pine & Timber, Inc. v. United States,* 50 Fed.Cl. 35, 58–59 (2001). The *Precision Pine & Timber, Inc.* court identified the implied duty not to hinder performance of contracts and the implied duty to cooperate as subspecies of the implied duty of good faith. *Id.* at 59. "If the contract contains a specific warranty, a breach of that warranty breaches the implied duty to cooperate." *Id.* The plaintiff nor the defendant claim that the DFWA south loop ductbank project contract specifications warranted the availability of escorts on the project or warranted the availability to work extended hours. Therefore, "if there is no specific warranty, an unreasonable delay that is caused in some way by the Government can breach the implied duty not to hinder." *Id.; see also Lewis–Nicholson, Inc. v. United States,* 213 Ct.Cl. at 205, 550 F.2d at 32 (holding that government-caused delay in contractor performance violated implied duty not to hinder performance of the other party).

■ "In order for a delay to give rise to a breach of the implied duty to cooperate, the contractor must satisfy two elements." *Precision Pine & Timber, Inc. v. United States,* 50 Fed.Cl. at 59. First, the contractor must prove that the cause of the delay was the fault of the government. *Id.; see also Koppers/Clough v. United States,* 201 Ct.Cl. 344, 363, 1973 WL 21338 (1973); *L.L. Hall Constr. Co. v. United States,* 177 Ct.Cl. 870, 879, 379 F.2d 559, 564 (1966); *Cedar Lumber, Inc. v. United States,* 5 Cl.Ct. 539, 550 (1984). It is the plaintiff's burden to establish government fault when claiming a breach of the implied duty to cooperate. Then the defendant can attempt to negate liability by demonstrating good faith and diligence. *See Summit Contractors, Inc. v. United States,*

23 Cl.Ct. 333, 336 (1991). "Second, the delay must be of sufficient magnitude and the delay must be of a sufficient hindrance to the operations of the contractor to constitute a breach." *Precision Pine & Timber, Inc. v. United States,* 50 Fed.Cl. at 59 (citations omitted); *see also Commerce Int'l Co. v. United States,* 167 Ct.Cl. at 536, 338 F.2d at 86 (holding that "[t]he lapse of time must be tied to the defendant's breach of its obligation of reasonable cooperation."); *Malone v. United States,* 849 F.2d 1441, 1445 (Fed. Cir.1988); *Walter Dawgie Ski Corp. v. United States,* 30 Fed.Cl. 115, 130 (1993) ("Under the duty to cooperate, the government may not fail to cooperate reasonably with the contractor in the performance of a contract. Breach of this duty generally implicates the reasonableness of the Government's acts or omissions. Furthermore, the nature and scope of this duty depends upon the facts and circumstances of the case.") (citations omitted). In addition, "[n]o matter how unreasonable the delay by the defendant, in order to recover the plaintiff must show that the delay caused material damage." *Cedar Lumber, Inc. v. United States,* 5 Cl.Ct. at 550.

The contract at issue in this case did not guarantee a specific level of escort service available, to the contrary, plaintiff was warned to expect delays. Therefore, to prove that the defendant breached its implied duty to cooperate, the plaintiff must show that either or both the alleged unavailability of escorts to accompany MBI work crews on and off the AOA and the defendant's failure to grant requests for extended work hours caused MBI to suffer unreasonable delay. As one of the busiest airports in the world, with thousands of daily flights, the construction work on the DFWA required that numerous restrictions and requirements be imposed on contractors for efficient and safe operation of DFWA and the maximum flexibility and safety for contractor personnel. To further these policies, the DFWA south loop ductbank project contract specifications advised potential bidders that contractors and their equipment must be escorted on and off the AOA by DFWA airport operations officers. The contract provided that escorts would be coordinated by the RE

and that the CO would make every effort "to reduce impact [of the escorts] to the construction." The contract stated that the escorts were provided by DFWA, not the defendant, and that "DFW Airport AO escorts may be limited. The Contractor should expect and plan for some delays in the movement of personnel, equipment, and material to and from the contract sites. Every effort will be made by the Contracting Officer to reduce impact to the construction." Consequently, the defendant, responding to the limited number of DFWA provided escorts, received permission from DFWA to train and did provide additional escorts dedicated for the use of MBI on the DFWA south loop ductbank project, in order to assist the contractor.

In the case of *Summit Contractors, Inc. v. United States,* the United States Claims Court found that the defendant did not breach its implied duty to cooperate when the contractor brought a similar claim for breach of the implied duty to cooperate caused by the inaccessible work area in a timber sales contract. *Summit Contractors, Inc. v. United States,* 23 Cl.Ct. at 335. In *Summit,* the court found that the plaintiff's claim failed because the contract advised bidders to expect delays in the removal of timber from the sales area. *Id.* In its analysis of the plaintiff's claim, the *Summit* court stated the following:

> Even if Summit experienced material delays in timber removal, the court notes that the Forest Service made a reasonable effort to mitigate potential difficulties in contract performance. The government put Summit on notice prior to award that there would be delays in logging operations. Having been informed of anticipated delays, plaintiff was in a better position to overcome performance difficulties and complete the work in a timely manner. Since the delays were foreseen and expected by plaintiff, it is apparent that Summit, not the Forest Service, assumed the risk of performance delays.

*Id.* at 336; *see also Commerce Int'l Co. v. United States,* 167 Ct.Cl. at 539, 338 F.2d at 87 (finding that the plaintiff cannot claim a

breach of the implied duty to cooperate when the plaintiff was advised prior to contract acceptance that there would be delays in the defendant controlled requisitioning process).

The plaintiff was advised by the contract specifications to anticipate delays associated with escorts and the defendant attempted to minimize these delays by providing dedicated escorts for the project. Although the plaintiff claimed that the work crews would at times have to wait up to thirty minutes for an escort, as the *Summit* court found, MBI was notified of the delays and was in the best position to "overcome performance difficulties and complete the work in a timely manner." *Summit Contractors, Inc. v. United States*, 23 Cl.Ct. at 336. Plaintiff has not shown that the delay caused by the availability of escorts on the DFWA south loop ductbank project was the fault of the defendant. *See Precision Pine & Timber, Inc. v. United States*, 50 Fed.Cl. at 59; *Summit Contractors, Inc. v. United States*, 23 Cl.Ct. at 336; *Cedar Lumber, Inc. v. United States*, 5 Cl.Ct. at 550; *see also Commerce Int'l Co. v. United States*, 167 Ct.Cl. at 539, 338 F.2d at 86 ("[T]he plaintiff cannot prevail merely by proving that there was a lapse of time in receiving materials or even that the defendant was the source of that lapse.").

■■■ The plaintiff has further claimed that the government breached the implied duty to cooperate by failing to allow extended work hours. The plaintiff claims that its requests were reasonable and that the government promised that it would use every effort to avoid disruption in the contractor's work. The contract provided that MBI was able to work up to twenty hours per day in two-ten hour shifts as necessary to meet the project completion date. Work on Saturday, Sunday and Federal holidays, and additional nighttime hours were not permitted without prior written approval. On July 12, 1994, the plaintiff submitted a request to regularly work a six-day, twelve-hour per day operation. CO Ramsey denied the request, stating that "as need arises the government will consider granting a sixth working day." The defendant did approve the twenty-three individual requests for extended work hours, granting MBI authority to work additional

Saturday and Sunday work days during contract performance.

The plaintiff cites a Board of Contract Appeals (BCA) decision and a Court of Claims decision to support its claim that the government breached its implied duty to cooperate by not granting extended work hours. The cases are distinguishable. In *In re OFEGRO*, H.U.D.B.C.A. No. 88–3410–C7, 91–3 B.C.A. (CCH) ¶ 24,206, 1991 WL 144232 (1991), the BCA found the defendant had delayed the contractor by withholding its review of certain task reports submitted by the plaintiff. *Id.* at 121,088–121,089. The contract in *In re OFEGRO*, however, explicitly imposed time limits to which the government had to conform during the review process. *Id.* at 121,089. When the government did not comply with the contract specifications it was held liable. *Id.* at 121,089. The contract specifications of the DFWA south loop ductbank project allowed MBI to request additional work days on an individual basis, but did not direct a particular response by the government, leaving the response to the discretion of responsible government officials. Therefore, when CO Ramsey denied the request for a permanent six day, twelve-hour per day work week, he was in compliance with the contract specifications.

The plaintiff also cites *Hoel–Steffen Construction Co., v. United States*, 231 Ct.Cl. 128, 684 F.2d 843 (1982), to support its claim that the government breached its implied duty to cooperate by not granting extended work hours. The *Hoel–Steffen* court addressed whether a CO's refusal to allow the general contractor to substitute a subcontractor was arbitrary and capricious. *Hoel–Steffen Constr. Co., v. United States*, 231 Ct.Cl. at 129, 684 F.2d at 844. The *Hoel–Steffen* court held that the CO's refusal of the request to substitute the subcontractor was in disregard of case law, industry custom and practice, and the intent of the contract specifications. *Hoel–Steffen Constr. Co., v. United States*, 231 Ct.Cl. at 138, 684 F.2d at 849. In comparison, MBI has claimed that the CO Ramsey breached the implied to duty to cooperate by not authorizing a six-day, twelve-hour per day work week. CO Ramsey's refusal in this case, however, is distinguish-

able from the CO's refusal in *Hoel–Steffen.* The DFWA south loop ductbank project contract explicitly stated the available work days and hours for contract performance and provided that upon request, the CO would grant extra work days. In fact, CO Ramsey granted plaintiff's requests for twenty-three extra work days, although he rejected a request for a six day, twelve-hour per day work week. Under the contract, CO Ramsey did not abuse his discretion.

Although the plaintiff has alleged that it was delayed in contract performance by the alleged breach of the implied duty of cooperation by the government due to the unavailability of escorts and the denial of the permanent extended work hours, the plaintiff has not shown that the delay was the fault of the defendant. *See Precision Pine & Timber, Inc. v. United States,* 50 Fed.Cl. at 59. The contract notified the plaintiff that the availability of DFWA escorts would be limited and could result in some delay moving on or off the AOA. In fact, the defendant attempted to alleviate the delay caused by DFWA escorts by training and providing its own additional escorts. In addition, the defendant did not deny the contractor extra work days, but rather denied the plaintiff a wholesale modification of the work hours prescribed by the contract specifications. Under these facts and circumstances, the court does not find that the defendant created an unreasonable delay and, therefore, the government did not breach the implied duty to cooperate.

## V. Differing Site Conditions

For over a half a century the Differing Site Conditions clause has been used in government contracts and has been interpreted by the courts. *See Olympus Corp. v. United States,* 98 F.3d 1314, 1316 (Fed.Cir.1996). The purpose of the clause has "been to shift the risk of adverse subsurface or latent physical conditions from the contractor, who normally bears such risk under a fixed-price contract, to the government." *Id.* While it is recognized that the Differing Site Conditions clause is a risk shifting mechanism, it does not shift all unanticipated risk in a project's site conditions to the government. *See id.* at

1317. The Federal Circuit articulated the purpose of the Differing Site Conditions clause as follows:

> [T]he government bears only those risks that encourage "more accurate bidding." Those risks are shifted to the government so that contractors will not add to their bids the cost of assessing whether adverse subsurface conditions exist or the cost of confronting such conditions if and when they are encountered.

*Id.* (citation omitted).

The defendant has claimed that the presence of expansive clay soils and rock at the DFWA south loop ductbank project constituted differing site conditions and seeks compensation for the extra costs associated with the alleged differing site conditions. The plaintiff sought an equitable adjustment of the contract in its certified claim to CO Ramsey on April 8, 1996. In CO Ramsey's final decision of MBI's contract claims, CO Ramsey agreed that MBI had encountered rock at the project site and it constituted a differing site condition. CO Ramsey informed the plaintiff that since the rock encountered already had resulted in the equitable adjustment made to the contract in Contract Modification Nos. 0002 and 0004, no further compensation would be made for rock. He also informed the plaintiff that the plaintiff's claim regarding clay soils at the project site did not create a differing site condition, so that the plaintiff's claim was denied.

The contract contained the standard Differing Site Conditions clause which defines a differing site condition and provides the procedures and requirements a contractor must follow before it is able to recover an equitable adjustment to the contract. *See* 48 C.F.R. § 52.236–2. The Differing Site Conditions clause provides that when a contractor encounters a differing site condition it must promptly notify the CO in writing before the conditions are disturbed. *See id.* The clause also defines the two types of differing site conditions as follows:

> (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an

unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract. *Id.* The Differing Site Condition clause also grants authority to the CO to make an equitable adjustment to the contract if the CO determines the alleged differing site condition satisfies the definition provided in the clause. *See id.; see also H.B. Mac. Inc. v. United States,* 153 F.3d 1338, 1343 (Fed.Cir. 1998).

### A. Additional Compensation for Rock as a Differing Site Condition

MBI's complaint states that the defendant recognized a differing site condition in the form of rock and issued two unilateral change orders authorizing an increase in the contract price. CO Ramsey issued unilateral Contract Modification No. 0002 on May 30, 1995. The Contracting Officer awarded an increase of the contract price by $22,216.00, "as complete and equitable adjustment for the differing site condition." The contracting officer stated that "[t]he purpose of this modification is to provide an equitable adjustment for the differing site condition relating to rock encountered on line #1." In addition, on July 10, 1995, the plaintiff notified CO Ramsey that on June 16, 1995 MBI encountered rock while excavating and requested $292.13 for labor and equipment for the extra work. By unilateral Contract Modification No. 0004, dated March 21, 1996, the CO granted the request for $292.13 for the differing site condition requested by the plaintiff's July 10, 1995 notice.

The plaintiff's claim to the contracting officer stated that the unilateral modifications compensated MBI for the direct costs for encountering rock, but "the costs accounted for in those change orders did not address either the productivity losses associated with the rock, nor the impact of the condition on MBI's ability to achieve its expected early completion." CO Ramsey denied the plaintiff's claim for additional compensation for rock in his final decision, dated August 16, 1996. CO Ramsey stated that "any additional adjustment to the contract for any alleged rock encountered is denied." The plaintiff's complaint generally claims compensation for

"differing site conditions." In its initial post-trial brief, however, plaintiff states that "the rock and clay are compensable Type I Differing Site Conditions," and requests compensation in its delay claims for difficulties encountered, not specifically mentioning rock. Presumably, the plaintiff's Type I claim as to rock has been taken care of by the CO's two unilateral contract modifications and the remaining claim regarding the impact of rock during contract performance relates to plaintiff's delay claim. Moreover, in the record before the court, plaintiff has failed to provide evidence of encountering any additional Type I rock differing site condition at the project site.

### B. Type I Differing Site Condition Claim in the Form of Clay

■ As discussed above, to prevail on a claim for a Type I differing site condition, a contractor must prove by a preponderance of the evidence that the soil conditions encountered at the project site materially differ from those contained in the contract documents, the soil conditions must have been reasonably unforeseeable based on all the information available to the plaintiff at the time it submitted its bid, and the plaintiff must show that it reasonably relied upon its interpretation of the contract and contract-related documents. Finally, the plaintiff must show that as a consequence of the difference between the expected and the encountered soil conditions the plaintiff suffered damages. *See H.B. Mac. Inc. v. United States,* 153 F.3d at 1345; *Stuyvesant Dredging Co. v. United States,* 834 F.2d 1576, 1581 (Fed.Cir.1987).

The threshold issue of whether the plaintiff is eligible for an equitable adjustment for a Type I differing site condition for clay soils at the project site as alleged, depends on the soil conditions indicated in the contract. *See Randa/Madison Joint Venture III v. Dahlberg,* 239 F.3d 1264, 1274 (Fed.Cir.2001) ("This court has previously explained that 'in order to establish entitlement to an equitable adjustment by reason of a Type I differing site condition[,] ... the contractor must prove, by a preponderance of the evidence, that the conditions indicated in the contract

differ materially from those it encounters during performance.'") (citing *H.B. Mac., Inc. v. United States*, 153 F.3d at 1345); *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984) ("As a threshold matter, then, this kind [Type I] of Differing Site Conditions claim is dependent on what is 'indicated' in the contract."); *Round Place, Inc. v. United States*, 31 Fed. Cl. 749, 751 (1994) ("An express representation in a contract specification or drawing furnished by the government to the contractor depicting specific conditions on a site can result in Type I Differing Site Conditions, if other conditions are encountered during construction."). The United States Court of Appeals for the Federal Circuit has made it clear that "[a] contractor cannot be eligible for an equitable adjustment for changed conditions unless the contract indicated what those conditions would supposedly be." *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d at 916; *see also H.B. Mac, Inc. v. United States*, 153 F.3d at 1345.

■■■■ The plaintiff stipulated that the solicitation, specifications, and drawings did not indicate the type of soil at the DFWA project site.[9] Moreover, the plaintiff concedes that if a contract is silent as to the particular physical conditions at a project site, there can be no Type I differing site condition because no contract indications exist to compare to actual conditions. According to the plaintiff:

> Because this contract permits a higher order of precedence for oral directions from the Contracting Officer than the actual written language of the contract (Specification Part I—Section G, Clause G–1), the Contracting Officer's representations and instructions concerning the normal soils at

the site has the same effect as an express contract provision.

"Determining whether a contract contained indications of a particular site condition 'is a matter of contract interpretation and thus presents a question of law, ....'" *H.B. Mac. Inc. v. United States*, 153 F.3d at 1345 (citation omitted). In similar fashion to its misrepresentation claim that the defendant breached the contract by misrepresenting the soil conditions at the DFWA, the plaintiff, once again, attempts to incorporate the alleged oral statements of CO Tressler into the contract through the Order of Precedence clause. MBI has not argued that there is a conflict between the specifications and the drawings, but has offered the alleged statements of CO Tressler as an oral specification, somehow incorporated into the contract through the Order of Precedence clause. As explained above, the alleged oral statements made by CO Tressler during the pre-bid conference are not incorporated into the contract through the Order of Precedence clause or in any other way. Once again, the court notes that the contract provided in the Explanation to Prospective Bidders clause, that "[o]ral explanations or instructions given before the award of a contract will not be binding." Moreover, as the court discussed above, the contract also admonished potential bidders under the Site Investigation and Conditions Affecting Work clause, that the government would not "assume responsibility for any understanding reached or representation made concerning conditions which can affect the work by any of its officers or agents before the execution of this contract, unless that understanding or representation is expressly stated in this contract."

> The expansive clay soils at the Dallas/Fort Worth Airport have been known to move as much as six (6) inches vertically in a given year. The 1% slope assures a larger margin of error if differential settlement does occur under the duct bank conduits ... The design parameters are based on Dallas/Fort Worth Airport's requirements for duct bank installation. The airport contract, "DFW/FAA Air Traffic Control Tower Ductbanks" was designed and constructed with 1% slopes on the conduit.

---

9. Courts that have addressed Type I differing site conditions have found "indications" of the site conditions in the contract in order to sustain the Type I differing site condition. *See Randa/Madison Joint Venture III v. Dahlberg*, 239 F.3d at 1274; *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d at 916. The contract for the DFWA south ductbank loop project was specifically engineered for clay soils, therefore, the plaintiff encountered the type of soil "indicated" in the contract. As CO Ramsey stated in his August 12, 1994 letter to the plaintiff:

Based on the absence of language in the contract regarding the type of soils and finding that the oral remarks of CO Tressler, if made, were not incorporated into the contract, the plaintiff cannot claim a Type I differing site condition for soils. *See P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d at 916 ("While it is true that a contract 'indication' need not be explicit or specific, the contract documents must still provide sufficient grounds to justify a bidder's expectation of latent conditions materially different from those actually encountered."); *Turnkey Enters., Inc. v. United States*, 220 Ct.Cl. 179, 188, 597 F.2d 750, 755 (1979) ("Category one recovery will be denied if the contract documents do not 'show' or 'indicate' anything about the alleged changed condition.").

### C. Type II Differing Site Condition Claim

The plaintiff states in its complaint that "the clay alone did not significantly affect MBI's costs, the combination of the clay with unforeseen rain or water constituted a changed condition which dramatically affected MBI's productivity and thus its costs." The plaintiff does not identify this alleged changed condition as a Type II differing site condition in its complaint, but only claims the defendant failed to fully compensate MBI for the costs of "differing site conditions." The plaintiff clarifies its claim in its initial post-trial brief by stating that "excessive rain combined with unexpected clay created a Type II differing site condition affecting post-November 1994 performance." The plaintiff alleges "where severe weather interacts with a misrepresented subsurface site condition or an unknown or unusual site condition, the risk shifts to the Government under the DSC provision." The plaintiff "seeks compensation not for excessive rain, but for unknown and unusual subsurface soil conditions which MBI could not reasonably have expected at the site combined with unusually severe weather."

██ The contract defines a Type II differing site condition as an "unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily

encountered and generally recognized as inhering in work of the character provided for in the contract." In order for the plaintiff to recover for the alleged Type II differing site condition, the condition must have existed at the time the contract was executed. *See Olympus Corp. v. United States*, 98 F.3d 1314, 1317 (Fed.Cir.1996) ("Our precedent has long imposed a temporal limitation on the applicability of the Differing Site Conditions clause and the Changed Conditions clause. These clauses have only been applied to conditions existing when a contract was executed, not to those that developed during performance.") (citing *John McShain, Inc. v. United States*, 179 Ct.Cl. 632 [,638], 375 F.2d 829, 833 (1967); *Arundel Corp. v. United States*, 96 Ct.Cl. 77, 116 (1942)).

██ Analogous to the rule that a differing site condition must exist before the execution of the contract, a contractor typically cannot recover for a post-award phenomenon considered an act of God. The United States Court of Claims in *Turnkey Enter., Inc. v. United States*, 220 Ct.Cl. at 186, 597 F.2d at 754, articulated the rule as follows:

> Generally, the government, under the standard Differing Site Conditions Article, does not assume an obligation to compensate a contractor for additional costs or losses it incurs resulting solely from weather conditions, which neither party expected or could anticipate and not from any act or fault of the government. Weather conditions generally are considered to be acts of God.

*Id.*

The abnormal rainfall experienced by MBI at the project would typically fall within this limitation of the differing site conditions clause. *See id.*, 597 F.2d at 760 ("The drought conditions plaintiff complains about resulted solely from extended dry weather conditions which can properly be classified as an act of God."); *Baldi Bros. Constructors v. United States*, 50 Fed.Cl. 74, 80 (2001) ("The general rule is that the risk of severe weather in a particular region is not shifted to the Government via the Differing Site Conditions clause."); *Walser v. United States*, 23 Cl.Ct. 591, 595 (1991) ("Furthermore, case law indicates that the differing site conditions clause

generally does not cover weather conditions, which are deemed to be acts of God, when neither party assumed the risk for acts of God.").

■ A limitation exists to the general rule that a contractor cannot claim a differing site condition arising from abnormal or severe weather experienced during a construction contract. *See John A. Johnson Contracting Corp. v. United States,* 132 Ct. Cl. 645, 132 F.Supp. 698 (1955). In *John A. Johnson,* the contractor was awarded a contract to construct 122 buildings for the United States Army General Hospital in Utica, New York, an area known for extreme cold weather. *Id.,* 132 F.Supp. at 699. The construction plan called for terracing a sloping hillside and for placing roads and buildings on a succession of levels. The construction of the roads and their drains was let to another contractor. *Id.* The *John A. Johnson* court found that the roads that the plaintiff used during construction had become a "quagmire" during the spring thaw because when the roads were initially graded and constructed, the ground was saturated with moisture which had frozen during the winter months. *Id.* at 699–700. The *John A. Johnson* court concluded that the deterioration of the construction roads due to the release of moisture from the frozen roadway during the spring thaw and the occurrence of three rainy months following the thaw, constituted a changed condition entitling the plaintiff to an equitable adjustment. *Id.* at 704. Similarly, in *In re D.H. Dave and Gerben Contracting Co.,* A.S.B.C.A. No. 6257, 1962 B.C.A. (CCH) ¶ 3493, 1962 WL 939 (1962), the Armed Services Board of Contract Appeals found that when site conditions in the form of a flawed drainage system interacted with severe weather, the plaintiff encountered a changed condition and observed the following:

> We note here that excessive rainfall is not in and of itself a changed condition for which price and time adjustments are to be made under the Changed Conditions article. Likewise excessive rainfall is not in and of itself a suspension of work nor is the contracting officer under a duty to suspend merely because of such rainfall.

But when as here excessive rainfall in interaction with a drainage area makes specified performance impossible a changed condition does exist and the contracting officer—if he wants work done-must change the specifications so as to make it possible.

*Id.* at 17,837. *See also Baldi Bros. Constructors v. United States,* 50 Fed.Cl. at 80–81; *In re Welch Constr. Co., Inc.,* P.S.B.C.A. No. 217, 77–1 B.C.A. (CCH) ¶ 12,322, 1977 WL 1883 (1977) ("To come within the clause, severe weather must interact with a misrepresented subsurface site condition or an unknown or unusual physical condition at the site as in *D.H. Dave & Gerben Construction Co.,* A.S.B.C.A. No. 6257, 1962 B.C.A. ¶ 3493, 1962 WL 939."); *In re Kilgallon Constr. Co., Inc.,* A.S.B.C.A. No. 51601, 01–2 B.C.A. ¶ 31,-621, 2001 WL 1187053 (2001) ("It [plaintiff] must also prove that interaction of the rain with the pre-existing and unknown site condition produced unforeseeable consequences, i.e., in this case, that unknown soils exhibited behavior or properties when saturated that were not reasonably anticipated.").

■ In the instant case, the inquiry is whether MBI can prove by a preponderance of the evidence that the clay soil conditions encountered at DFWA south loop ductbank project were unknown or unusual and, although not necessarily a Type II differing site condition in and of itself, became a Type II differing site condition when the soil combined with abnormal precipitation experienced after November 1994, so that it resulted in a unknown, unusual or unforeseeable condition sufficient to constitute a Type II differing site condition. *See Baldi Bros. Constructors v. United States,* 50 Fed.Cl. at 80 ("[W]hen severe weather interacting with an undisclosed property of the construction site delays construction, the Government has been held responsible."); *In re F.D. Rich Co.,* A.S.B.C.A. No. 6515, 1963 B.C.A. (CCH) ¶ 3710, 1963 WL 1014 (1963) ("Under some circumstances the interaction of water and soil might constitute a changed condition. There is no contention that the factors of weather, water and soil taken alone were unknown."); *In re Kilgallon Constr. Co., Inc.,* A.S.B.C.A. No. 51601, 01–2 B.C.A. ¶ 31,-

621, 2001 WL 1187053 (finding that the plaintiff did not establish that the native soils at the project site were unusual or that they behaved in an unexpected, unforeseeable manner when subject to severe winter rains); *In re S. Paving Corp.*, A.G.B.C.A. No. 74–103, 77–2 B.C.A. (CCH) ¶ 12,813, 1977 WL 27114 (1977) ("Here the moisture retention qualities of the soil, due to its borderline consistency, were unknown and unusual, and when the abnormal rainfall saturated the soils to the extent that they could not be excavated and used as contemplated, there was a category two condition in the upper layer."); *see also In re Welch Constr. Co., Inc.*, P.S.B.C.A. No. 217, 77–1 B.C.A. (CCH) ¶ 12,322, 1977 WL 1883.

For the clay soils and the precipitation at the DFWA south loop ductbank project to qualify as a Type II differing site condition, MBI is "confronted with a relatively heavy burden of proof." *Charles T. Parker Constr. Co. v. United States*, 193 Ct.Cl. 320, 333, 433 F.2d 771, 778 (1970). "Under [Type II] . . . the Government has elected not to presurvey and represent the subsurface conditions with the result that a claimant must demonstrate that he has encountered something materially different from the 'known' and the 'usual.' This is necessarily a stiffer test because of the wide variety of materials ordinarily encountered when excavating in the earth's crust." *Id.*, 433 F.2d at 778 (footnotes omitted); *see also Randa/Madison Joint Venture III v. Dahlberg*, 239 F.3d at 1276; *Fru–Con Constr. Corp. v. United States*, 44 Fed.Cl. 298, 311 (1999).

CO Ramsey testified at trial that he determined that MBI experienced unusually severe weather while working at the DFWA. CO Ramsey testified that the precipitation accumulated during the contract period was nearly double the normal rainfall average. From December 1994 through April 1995, MBI lost seventy out of a possible 102 work days due to abnormal precipitation and its effect on the clay soils at the DFWA. Given the severe weather experienced by the plaintiff, if the presence of expansive clay soils at the DFWA, was unknown, unusual or unforseen to MBI, and the interaction of the expansive clay soils with the abnormal precip-

itation caused unknown conditions which "differ[ed] materially from those ordinarily encountered and generally recognized as inhering in the type of work provided for in the contract," *Fru–Con Constr. Corp. v. United States*, 44 Fed.Cl. at 312, the plaintiff could recover for a Type II differing site condition. "In determining whether a particular condition is 'unusual,' the encountered condition is judged against the 'normal conditions for the area.' " *Neal & Co., Inc. v. United States*, 36 Fed.Cl. 600, 622 (1996), (citations omitted), *aff'd*, 121 F.3d 683 (1997). The court must determine whether the clay soils present at the DFWA were of an unknown and unusual type of clay that, when combined with the abnormal precipitation after November 1994, resulted in a unknown, unusual or unforeseen condition that constituted a Type II differing site condition.

Among the plaintiff's bidding documents for this project, the court received into evidence a subcontractor's bid for the boring and tunneling work required on the DFWA south loop ductbank project. The subcontractor's bid indicated that the bid was based on soil comprised of "Sandy Clay" at the DFWA for estimating purposes. Mr. Robert Fureby was questioned about this document during cross-examination as follows:

Q. Yes, that appears to be a quotation for Boring and Tunneling Company of America, is that correct?

A. Correct.

Q. And they submitted it and you received and reviewed this, is that correct?

A. I did.

Q. If you'd move down to roman numeral IV, type soil, under type soil it says sandy clay, is that correct?

A. That's what it says.

Q. And on this date it indicates it was submitted on February 5, 1994, did you receive it on or about that date?

A. I believe so.

Q. Mr. Fureby, you knew there was clay there when you bid this job, is that right?

A. We may have known there was clay there, by this, by what they have stat-

ed here, a sandy clay, I don't recall ever running across any sandy clay on the job. Sand and clay makes it less impervious.

\* \* \* \* \* \*

Q. You testified yesterday that before this case you didn't recall ever using the term normal soil. Let me ask again, when you bid the job as normal soil, you knew there was clay there, right?

A. There may have been some clay that was not problematic, but the quotation from this individual that you just referred me to, which says sandy clay, we didn't run across any sandy clay on the job.

At trial, the plaintiff's geotechnical engineering expert, Mr. Brumund, admitted that although his previous experience working in Texas was in the Houston area, and he did not have experience working at the DFWA, he knew there were expansive clay soils at the airport. As discussed above, defendant's geotechnical engineering expert, Mr. Gregory, testified that he consulted the soil survey maps of Dallas and Tarrant Counties, Texas, the Dallas Sheet of the Geological Atlas of Texas, and the boring data obtained from the DFWA document center and found these resources indicated that the type of soil surrounding the DFWA was expansive clay soils. Mr. Gregory also conducted an informal survey of local engineering and construction firms in the DFWA area. Mr. Gregory surveyed seven geotechnical engineers, one structural engineer, and two contractors and received the unanimous answer that a contractor should expect clay soil at DFWA.

The plaintiff's and defendant's experts agreed that the type of clay soils to be encountered at the DFWA would be highly expansive clay soils. Defendant's expert stated that it was "essentially a 100 percent probability" that MBI would encounter expansive clay soils at the DFWA. The experts also agreed that when highly expansive clay soils become wet, the soil becomes difficult for contractors to perform their work due to the soils becoming plastic. As plaintiff's expert stated, when this type of soil becomes plastic, construction work can be delayed.

The soil survey maps for Dallas and Tarrant counties, Texas, published by the Department of Agriculture, and referred to by Mr. Gregory, define the type of clay soils in and around the DFWA as "Houston Black clay." According to the soil survey maps, "[t]his soil [Houston Black clay] is moderately well drained. Permeability is very slow, and available water capacity is high. Runoff is medium, and the hazard of erosion is moderate. *The soil is difficult to work during extremes in moisture conditions.*" (Emphasis added). Additionally, Mr. Gregory provided a national geological publication, the Bulletin of the Association of Engineering Geologists, which examined the geology of Dallas, Texas and found that the "most formidable constraint to all construction activity in the Dallas area is the presence of expansive material." The Bulletin states that the "[e]xpansive material problems are compounded by the local climate (long, hot, dry summers and moderately wet springs and falls)."

The testimony of the soil experts presented by the parties and Mr. Robert Fureby, as plaintiff's bid preparer, show that the presence of clay soils at the DFWA was not "a previously unknown physical condition at the site which differs materially from those conditions ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." *Hardwick Bros. Co., II v. United States*, 36 Fed.Cl. 347, 409 (1996). Moreover, the parties' experts agreed that a national utility contractor working throughout the United States performing underground excavation, such as MBI, would have experience working in expansive clay soils.

The combination of expansive clay soils and precipitation caused difficulties for the various crews on the DFWA south loop ductbank project. These difficulties, however, are the usual and reasonable problems encountered when expansive clay soils interact with moisture and do not constitute a Type II differing site condition. *See Hardwick Bros. Co., II v. United States*, 36 Fed.Cl. at 410 (finding a contractor that faces problems arising out of clay soils becoming saturated

does not establish a Type II differing site condition).

In the typical Court of Claims and the various Board of Contract Appeals cases that have found a Type II differing site condition when a site condition interacts with abnormal weather conditions, prior to finding a Type II differing site condition, the decisions have identified an unknown, unusual, or unforeseen physical condition at the project site first, and then considered whether the interaction of abnormal weather created a Type II differing site condition. *See John A. Johnson Contracting Corp. v. United States*, 132 Ct.Cl. at 704, 132 F.Supp. at 700 (finding unforeseen difficulties in the construction of the roads, unusual capillarity of the soil, and inadequate drainage ditches, combined with abnormal weather conditions created a Type II differing site condition); *In re D.H. Dave and Gerben Contracting Co.*, A.S.B.C.A. No. 6257, 1962 B.C.A. (CCH) ¶ 3493, 1962 WL 939 (finding that an unknown defectively designed government drainage system failure in conjunction with abnormal precipitation created a Type II differing site condition.); *In re S. Paving Corp.*, A.G.B.C.A. No. 74–103, 77–2 B.C.A. (CCH) ¶ 12,813, 1977 WL 27114 (finding that the soil conditions at the project site were unknown and unusual as evidenced by conflicting government conducted soil borings combined with abnormal weather conditions created a Type II differing site condition). As the Armed Services Board of Contract Appeals stated in *In re F.D. Rich Co.*, A.S.B.C.A. No. 6515, 1963 B.C.A. (CCH) ¶ 3710, 1963 WL 1014, "[t]he mere fact that excessive precipitation may have affected soil more than normal precipitation would not necessarily constitute a changed condition."

The expansive clay soils was a condition at the DFWA south loop ductbank project that was not unknown, unusual or unforeseen and did not differ from those conditions ordinarily encountered or generally recognized in

underground utility construction work in the area. *See Hardwick Bros. Co., II v. United States*, 36 Fed.Cl. at 409. In addition, under the Site Investigation and Conditions Affecting Work clause of the contract, MBI was required to "investigate[ ] and satisf[y] itself as to the ... uncertainties of weather ... [and] the conformation and conditions of the ground ...." 48 C.F.R. § 52.236–3(a). The plaintiff's expert confirmed that if a contractor does not inform itself of the soil conditions at a project site, they assume the risk of the type of soil a contractor will encounter. The plaintiff has not shown by a preponderance of the evidence that the expansive clay soils were unknown or unusual and therefore, plaintiff's Type II differing site condition claim for clay is denied.

## VI. Finish Early/Delay Claim

The plaintiff's delay claim states that its right to finish early was prevented due to: (1) design errors that disrupted the work in the critical first two months of the Project and represented a continuing problem throughout the remainder of the Project, (2) unduly restricted access to the work area due to inadequate escort services, and (3) lost productivity due to differing site conditions represented by the presence of rock in isolated areas of the site and extensive clay throughout the site which, combined with excessive rainfall, dramatically decreased MBI's production. If these events had not occurred, MBI would have finished the vast majority of its work before mid-November 1994, and would have avoided the extremely unproductive working conditions caused by the factors listed above and the extreme and unusual amount of rainfall in the winter and early spring of 1995. Additionally, MBI would have avoided the additional extended site and home office overhead incurred.

MBI alleges that the critical path [10] on the DFWA south loop ductbank project was the

---

10. The United States Court of Claims in *Haney v. United States*, defined the critical path and critical path analysis (CPA) as follows:

Essentially, the critical path method is an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects. Each

subproject is identified and classified as to the duration and precedence of the work. (E.g., one could not carpet an area until the flooring is down and the flooring cannot be completed until the underlying electrical and telephone conduits are installed.) The data is then analyzed, usually by computer, to determine the

line excavation work, it was this work that was directly affected by the "clay and rock, by the escort limitations and by the additional utilities." MBI alleges that "these claim events directly impacted the critical path activity which, absent disruptions, would have been completed in time to allow for substantial completion by mid-November 1994." The plaintiff relies on the expert opinion of Messrs. Gabrielse and Vail to establish MBI's ability to complete the critical path of the project by mid-November 1994 and the alleged damages suffered by MBI as a result of the claimed interferences by the defendant.

A claim that the government prevented a contractor from completing a contract early was addressed by the Court of Claims in *Metropolitan Paving Co. v. United States*, 163 Ct.Cl. 420, 325 F.2d 241 (1963). The court in *Metropolitan Paving Co.* reviewed a claim by a contractor that the government and its employees had failed to cooperate with the contractor, that government employees deliberately harassed and used dilatory tactics to delay the contractor, and that the inadequate supervision by the contracting officer prevented the contractor from completing the project ninety-four days before the scheduled completion date. *Metro. Paving Co. v. United States*, 163 Ct.Cl. at 421–22, 325 F.2d at 242. The court in *Metropolitan Paving Co.* found that the question before the court was not whether the contractor could recover for delay even though the contractor completed the project within the specified time, but whether the contractor could prove it was damaged by the alleged

conduct of the government and its employees. *Id.* The court explained:

> While it is true that there is not an "obligation" or "duty" of defendant to aid a contractor to complete prior to completion date, from this it does not follow that defendant may hinder and prevent a contractor's early completion without incurring liability. It would seem to make little difference whether or not the parties contemplated an early completion, or even whether or not the contractor contemplated an early completion. Where defendant is guilty of "deliberate harassment and dilatory tactics" and a contractor suffers damages as a result of such action, we think that defendant is liable.

*Metro. Paving Co. v. United States*, 163 Ct. Cl. at 423, 325 F.2d at 242.; *see also Gardner Displays Co. v. United States*, 171 Ct.Cl. 497, 346 F.2d 585 (1965).

MBI states in its complaint that the defendant breached its contractual and other obligations by "interfering with MBI's right and plan to complete the majority of its work by mid-November 1994." The plaintiff states that it is "entitled to reap the benefit or cushion of extra time that would result from the planned early completion of work" on the project, and that "[r]ecovery for early finish may alternatively be provided for under the Suspension of Work or the Changes Clause of the Contract."

The Suspension of Work clause [11] and the

most efficient schedule for the entire project. Many subprojects may be performed at any time within a given period without any effect on the completion of the entire project. However, some items of work are given no leeway and must be performed on schedule; otherwise, the entire project will be delayed. These latter items of work are on the "critical path." A delay, or acceleration, of work along the critical path will affect the entire project. *Haney v. United States*, 230 Ct.Cl. 148, 167–68, 676 F.2d 584, 595 (1982).

11. The Suspension of Work clause, 48 C.F.R. § 52.242–14, states in relevant part:
(b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted (1) by an act of the Contracting Officer in the adminis-

tration of this contract, or (2) by the Contracting Officer's failure to act within the time specified in this contract (or within a reasonable time if not specified), an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been *so* suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor, or for which an equitable adjustment is provided for or excluded under any other term or condition of this contract.

Changes clause [12] of the contract allows the contractor to recover for delay claims asserted against the government. *Compare Chaney and James Constr. Co. v. United States,* 190 Ct.Cl. 699, 707, 421 F.2d 728, 732 (1970) (holding that a government contractor may recover for a delay claim under the Suspension of Work clause and "[i]t would thus follow that if plaintiff could recover for all of the delay caused by defective specifications in an action at law for breach, it should be able to obtain a similar recovery under the contract."), *and Blinderman Constr. Co., Inc. v. United States,* 695 F.2d 552, 557 (Fed. Cir.1982) ("[I]f any part of the contractor's work was thereafter delayed for an unreasonable period of time because the Navy's failure to provide access to the apartments, the contractor is, under the 'Suspension of Work' clause, entitled to an increase in the cost of performing the contract.") (footnote omitted), *with Coley Prop. Corp. v. United States,* 219 Ct.Cl. 227, 235, 593 F.2d 380, 385 (1979) (applying the Changes clause of the contract to compensate the plaintiff because "[t]he delay that the changes the government ordered in the [building] caused Coley in completing the tower portion, with its concomitant additional expenses to Coley in completing the tower, is an item of additional impact cost for which the government is liable, even though Coley still was able to complete the tower portion within 3 years after the [building] was turned over to the Post Office."), *and In re Owen L. Schwam Constr. Co.,* A.S.B.C.A. No. 22407, 79-2 B.C.A. (CCH) ¶ 13,919, 1979 WL 2357 (1979) ("Under such circumstances we hold that appellant has, by a preponderance of the evidence, established that the above-described Government actions and inactions, which we considered tantamount to changes to appellant's contract performance, caused appellant to miss its early completion date.... Accord-

ingly, the delays of the Government in resolving the aforementioned deficient drawings and specifications rendering appellant incapable of meeting its planned early delivery date are remediable under, not only the Suspension of Work clause, but also the Changes clause of the contract.").

■ A contractor seeking compensation for alleged government-caused delay must establish the following:

(1) whether and to what extent any part of the contractor's work was unreasonably delayed by the [government's] failure to provide access to the [work site]; (2) whether any unreasonable delays caused by the [government] were concurrent with or separate from delays due to the subcontractor's shortage of labor or other delays chargeable to the contractor; and (3) whether the contractor is entitled to a time extension and/or a recovery of damages and if so, how much.

*Blinderman Constr. Co., Inc. v. United States,* 695 F.2d at 559; *see also W.M. Schlosser, Inc. v. United States,* 50 Fed.Cl. 147, 152 (2001); *Coastal Indus., Inc. v. United States,* 32 Fed.Cl. 368, 372 (1994); *Commercial Contractors, Inc. v. United States,* 29 Fed.Cl. 654, 662 (1993).

The burden of establishing these factors falls squarely upon the contractor. *William F. Klingensmith, Inc. v. United States,* 731 F.2d 805, 809 (Fed.Cir.1984); *Avedon Corp. v. United States,* 15 Cl.Ct. 648, 653 (1988). Moreover, "[o]nly if the delay was caused *solely* by the government will the contractor be entitled to both an extension of time within which to perform, and recovery of excess costs associated with the delay." *Weaver–Bailey Contractors, Inc. v. United States,* 19 Cl.Ct. 474, 476 (1990) (emphasis in original) (citing *William F. Klingensmith, Inc. v. United States,* 731 F.2d at 809), *reconsid.*

---

12. The Changes clause, 48 C.F.R. § 52.243–4, states in relevant part:

(d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing. However, except for an adjustment based on

defective specifications, no adjustment for any change under paragraph (b) of this clause shall be made for any costs incurred more than 20 days before the Contractor gives written notice as required. In the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with the defective specifications.

*denied,* 20 Cl.Ct. 158 (1990); *G.M. Shupe, Inc. v. United States,* 5 Cl.Ct. 662, 700 (1984); *see also Blinderman Constr. Co. v. United States,* 695 F.2d at 559. The contractor must show that the government was the "sole proximate cause" of the delay and that no concurrent cause would have equally delayed the contract, regardless of the government's action or inaction. *Merritt–Chapman & Scott Corp. v. United States,* 208 Ct.Cl. 639, 650, 528 F.2d 1392, 1397–98 (1976); *Avedon Corp. v. United States,* 15 Cl.Ct. at 653, 659 (recovery denied "because concurrent delays rendered the [government-caused] delay ... irrelevant"). Moreover, "the court [will] award delay damages only for the unreasonable portion of a government-caused delay." *Mega Constr. Co., Inc. v. United States,* 29 Fed.Cl. 396, 425 (1993) (quoting *Wilner v. United States,* 26 Cl.Ct. 260, 263 (1992), *rev'd on other grounds,* 24 F.3d 1397 (Fed.Cir. 1994) (en banc)).

■ If both parties contribute to a delay, neither can recover damages from the other, "unless there is in the proof a clear apportionment of the delay and expense attributable to each party." *William F. Klingensmith, Inc. v. United States,* 731 F.2d at 809 (quoting *Blinderman Constr. Co. v. United States,* 695 F.2d at 559).

MBI claims that the critical path of the project was directly affected by the alleged differing site conditions of the clay and rock, by the alleged breach of the implied duty to cooperate as a result of limited escort availability which limited MBI's access to the project site, and by the additional time required for the location of unknown or misplaced utilities. The CO and the court have found the government liable for locating additional and unknown utilities encountered by MBI. The CO compensated the plaintiff for additional and unknown utilities, although plaintiff now claims delay damages for these additional and unknown utilities. The plaintiff has not shown, however, that the defendant is liable for the alleged differing site conditions of clay and rock or for the alleged governmental breach of the implied duty to cooperate through the interference with access to the work areas.

■ The government cannot be found liable for delay damages associated with encountering the additional utilities because the plaintiff has failed to present evidence at trial or through its expert witnesses to apportion the delay associated with the additional utilities from the uncompensable delay associated with site access and working in the clay soils. *See Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 192, 351 F.2d 956, 965 (1965). The United States Court of Claims addressed concurrent delays in *Commerce Int'l Co. v. United States,* 167 Ct.Cl. at 543, 338 F.2d at 89–90, and stated the following:

> The case suffers from more than the absence of specific proof of causation. There is an affirmative showing that other causes, for which the defendant was not responsible, contributed most materially to the delay in production. Plaintiff has not separated these delays from that charged to the defendant, and, on this record, the Commissioner has been unable to do so. Since, as we will show, we cannot say that he was wrong, we must apply the rule that there can be no recovery where the defendant's delay is concurrent or intertwined with other delays.

*Id.* (citations omitted).

The plaintiff stated in its complaint that it was the combination of the expansive clay soils with the excessive rainfall, additional utilities, and the alleged insufficient escorts that prevented MBI from completing the contract early. The testimony of MBI officials evidences the difficulty of separating the various alleged delays encountered by MBI on the project for purposes of determining the compensable delay. For example, Mr. Duane Fureby testified regarding the delay attendant to additional utilities, but was unable to specify with the level of accuracy needed to separate the delay from other normal work time required by the contract. Mr. Duane Fureby stated that the time needed to trench around a utility depended on what type and depth of the utility and generally described trenching operations. He did not, however, quantify the time with specificity.

Mr. Duane Fureby also testified regarding the alleged delay associated with the avail-

ability of escorts and stated that MBI "would wait most days for an escort and sometimes it was much worse than others." Mr. Smith, MBI's general manager during the project, testified about his limited experience with the availability of escorts. Mr. Smith stated that in the four trips onto the AOA during the project he experienced problems with the availability of escorts, but could not recall whether those problems occurred in 1994 or 1995. Nor could Mr. Smith specify the amount of the alleged delay that occurred with regard to the escorts, stating that the delay was between fifteen and forty-five minutes.

Mr. Paul Manuel, MBI's controller, testified regarding the company's payroll and equipment weekly worksheet. Mr. Paul Manuel testified that the payroll and equipment weekly worksheets for the project were produced by the project's foreman, who recorded the hours of each week for men and equipment. The payroll and equipment weekly worksheets also provide comments and details for the daily work. The comments and details, however, do no provide the level of detail necessary to determine the alleged delay associated with the rock, rain and clay, additional utilities, and the availability of escorts. For example, a given day may indicate rain occurred, but other entries provide even less detail, "Monday—boring on TW 27," "Tuesday—Lay approx 880′ conduit (8 way) Encase app. 420 [feet]," "Friday—Trench Back Fill & Compact." Because the entries are so general, it is difficult to ascertain from the type of evidence what component of the time used was attributable to normal work time requirements and what would be attributable to government caused delay.

The inability of MBI to separate the alleged differing causes of delay was further emphasized by the plaintiff's expert, Mr. Robert Vail. Mr. Vail is the founder and president of the Vail Network Company. Although Mr. Vail does not hold a degree in engineering, he has spent twenty-four years in the construction industry, most recently forming his own consulting company to serve the construction industry "by helping owners, contractors, architects/engineers to plan, organize, control and implement their construction processes." Mr. Vail testified that he reviewed the documents related to this project and rendered an opinion as to "whether Manuel Brothers could have completed this job per the original schedule that they had submitted, and also to look and see if they had incurred additional costs that may have come about because of any changes to the job." Mr. Vail produced a report detailing the alleged damages suffered by the plaintiff at the DFWA south loop ductbank project.

Mr. Vail's expert testimony and report did not separate the alleged delays attributable to the clay and rain, the availability of escorts, or the additional utilities. Regarding the clay soils and the weather experienced by MBI on the project, Mr. Vail testified that the contractor is responsible for the costs associated with abnormal weather. When asked whether the abnormal whether on the project cost MBI a fair amount of time and money, Mr. Vail replied, "I believe it did, yes, but I've not been able to make the distinction between the time lost to weather, the time lost to soils, utilities or escorts to—I don't have a precise number for what that would be, but I would presume that would be the case, yes."

Mr. Vail testified that he believed that a lack of government escorts impacted the work on the project. When asked to quantify the impact, Mr. Vail responded, "I am unable to know how much the impact was." He was also unable to say when the escorts impacted the work on the project, other then "throughout the project." Mr. Vail stated that he did not perform an independent analysis of whether the number of escorts available for the supervision of MBI personnel on and off the AOA was sufficient and whether MBI was delayed due to the availability of escorts, but based his analysis solely on information provided by the plaintiff's employees.

When Mr. Vail was questioned regarding his analysis of the impact of additional utilities on the DFWA south loop ductbank project, he stated the following:

Because we were unable to make the distinction on a daily basis how many hours

were lost on a given day and making the distinction between whether those hours were lost working around utilities, or whether it was lack of access because of the escorts, or because the soil conditions were changed. We were just unable—those three issues are so intertwined, we were unable to split then apart separately.

Included in his analysis of whether the plaintiff had the ability to complete the project by mid-November 1994 and his calculation of the alleged damages, Mr. Vail's report determined that 7.75 months over the as-planned duration of the project was attributable to the additional utilities, the availability of escorts, and the impact of the combination of the weather and clay. He testified that he based his determination on conversations with Mr. Robert Fureby, Mr. Gary Smith, and "perhaps Paul Manuel," although he could not remember with certainty. Mr. Vail deducted seven days from this calculation, which represented his determination that the plaintiff may have had some responsibility for the delay attributable to the problems associated with the India bore. The plaintiff, however, did not complete the India bore until almost eight months from the original date the boring was begun. Mr. Vail stated that although he did not believe the India bore was part of the critical path on this project, he "thought it was reasonable to make some deduct [sic] to eliminate the arguments of the reboring. It was in an effort to make some reduction, to show some good faith of if [sic] there is proven some shared blame that Manuel Brothers would have made a calculation to remove some of those costs."

The plaintiff also presented the testimony and expert report of Mr. Richard Gabrielse, a registered engineer in Missouri and Michigan, with over forty years experience in the construction industry. Mr. Gabrielse performed what he termed a parameter estimate, or conceptual estimate of the DFWA south loop ductbank project. Mr. Gabrielse examined the plans and specifications of the project and determined the trenching work as the critical path of the project. Mr. Gabrielse concluded that MBI could have completed the majority of the project within the

eighteen to twenty-two weeks that MBI had requested in their initial, unapproved Progress Work Schedule. Because Mr. Gabrielse performed an analysis of the estimated time for completion of the project and did not perform an analysis of the delay encountered by MBI on the project, his testimony did not aid the court in trying to apportion compensable delays from noncompensable delays.

Mr. Gabrielse's parameter estimate did not address the delay encountered by MBI on the project, but only reviewed whether MBI could have completed the project by mid-November 1994. Mr. Gabrielse's report assumed that the soil to be excavated would be "normal soil" and not the clay soils that MBI actually encountered. Mr. Gabrielse's report assumed that "[a]ccess to the site was to be reasonable" because the CO so indicated. The parameter estimate, therefore, does not allow the court to determine how the individual aspects of the clay and rain, the availability of escorts, and the additional utilities impacted the completion of the project.

The United States Court of Appeal for the Federal Circuit has stated that "courts will deny recovery where the delays are 'concurrent or intertwined' and the contractor has not met its burden of separating its delays from those chargeable to the Government." *Blinderman Constr. Co., Inc. v. United States*, 695 F.2d at 559. MBI has not presented the specific proof required for recovery under a delay claim. "The mere allegation that delays caused work to be disrupted or performed out of sequence, or caused costs to be increased, will not satisfy plaintiff's burden of proof." *Commercial Contractors, Inc. v. United States*, 29 Fed.Cl. at 662. Therefore, the government cannot be held liable for the alleged damages caused by the delay associated with additional utilities, since MBI has failed to separate that delay from the alleged delay caused by the rain and clay and the alleged insufficient availability of escorts.

### CONCLUSION

The court finds for the defendant on the plaintiff's claims of superior knowledge regarding the soil conditions at the DFWA south ductbank loop project, the implied duty

**54**

to cooperate, the misrepresentation claim, the alleged failure to provided sufficient escorts onto the AOA, and the Type I and Type II differing site conditions. The plaintiff, however, cannot recover any damages arising from this contract, even though the court and the contracting officer have found that the defendant is liable for the additional and unknown utilities as encountered by MBI at the project site. Because the plaintiff has failed to apportion the delay associated with the additional and unknown utilities from the uncompensable delays allegedly caused by the rain, clay, and alleged insufficient availability of escorts, plaintiff is not entitled to recover delay damages. The Clerk's Office shall enter judgment consistent with this opinion.

**IT IS SO ORDERED.**